

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-19-2000

# Nicini v. Morra

Precedential or Non-Precedential:

Docket 98-5193

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Nicini v. Morra" (2000). *2000 Decisions.* Paper 101.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/101

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 19, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5193

ANTHONY NICINI, JR.,
      Appellant

v.

EDWARD MORRA; NEW JERSEY DEPARTMENT OF
HEALTH AND HUMAN SERVICES, DIVISION OF YOUTH
AND FAMILY SERVICES; FRANK CYRUS; JOHN DOE(S),
a fictitious person or persons; XYZ ENTITY (IES),
a fictitious entity or entities

FRANK CYRUS,
       Appellee

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 95-cv-02303)
District Judge: Hon. Jerome B. Simandle

Argued January 26, 1999

Before: SLOVITER, McKEE, and RENDELL, Circuit  Judges

Reargued En Banc February 16, 2000

Before: BECKER, Chief Judge, SLOVITER, MANSMANN,
GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH,
McKEE, RENDELL, and BARRY, Circuit Judges

(Filed: May 19, 2000)

Joseph P. Grimes (Argued)
Grimes, Grimes, Grimes & Grimes
Cherry Hill, New Jersey 08034

   Counsel for Appellant

Peter Verniero
 Attorney General of New Jersey
Mary C. Jacobson (Argued)
 Assistant Attorney General
 Of Counsel
Yolanda C. Rodriguez
 Deputy Attorney General
 On the Brief
Trenton, New Jersey 08625

   Counsel for Appellee,
Frank Cyrus

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Anthony Nicini, Jr., filed suit under 42 U.S.C.S 1983 and state tort law against Frank Cyrus, a Family Services Specialist with the New Jersey Department of Human Services, Division of Youth and Family Services ("DYFS"), and other defendants, alleging they violated his constitutional rights because he was abused by the person with whom he was staying while in DYFS custody. The District Court, which had earlier dismissed all claims against the other defendants and the official capacity claim against Cyrus, granted summary judgment in favor of Cyrus on the section 1983 claim and state tort law claims against him in his individual capacity, holding that the facts of record did not establish a constitutional violation. Nicini appeals.

I.

FACTS

In February 1990, fifteen-year-old Anthony Nicini, Jr., was admitted to the John F. Kennedy Hospital's Crisis

2

Center (JFK) after an apparent suicide attempt. DYFS became involved when JFK notified it of Nicini's allegations that his father had physically abused him. Two DYFS caseworkers responded to JFK, and Nicini told them that he was afraid of his father, who "punches a lot" and "always hits with closed fist." App. at 212. Nicini also said that he had attempted suicide before. DYFS notified the prosecutor's office of Nicini's allegations and assisted his mother in obtaining a temporary restraining order against Nicini's father. DYFS also assigned caseworker Frank Cyrus to Nicini's case.

Nicini continued to have difficulty at home and in school. According to a DYFS report dated September 27, 1990, Nicini slashed his wrists that month in an apparent suicide attempt and thereafter left home after an argument with his mother. The report states that Nicini "has no where to go and needs placement." App. at 214. DYFS was informed on October 9, 1990, that Nicini was not at school and that he had previously told the assistant principal that he would not return home.[1] On October 10, 1990, DYFS received a call from the police in Cherry Hill, New Jersey, that Nicini had been located and that he had repeated his refusal to return home and again stated that his father was abusive. Ex. at 28. That same day, a DYFS caseworker contacted Nicini's mother, who said that she did not want Nicini to return home, and his father, who could not identify any relatives with whom Nicini could stay. Nicini's father came to DYFS to sign a foster care placement agreement.[2]

_____

1. See Exhibits to Nicini's Brief in Opposition to Summary Judgment at 27 [hereafter "Ex."].
2. Although the parties have not educated us as to the meaning of this agreement, it appears that "[a] child may come into the custody of [DYFS] and be placed in foster care pursuant to either a voluntary-placement agreement or a court order." Matter of Guardianship of J.C., 129 N.J. 1, 7, 608 A.2d 1312, 1314 (1992); see also N.J. Stat. Ann. S 30:4C-11 (parent may apply for DYFS to "accept and provide such care or custody as the circumstances . . . may require"); Monmouth County Div. of Social Servs. on Behalf of DYFS v. C.R., 316 N.J. Super. 600, 603-05, 720 A.2d 1004, 1006-07 (N.J. Super. 1998) (describing placement pursuant to agreement whereby parents consented to DYFS placing child in foster care but retained their "parental rights and legal responsibilities," retained the right to terminate the agreement and ask for their child's return, and agreed to make payments for the child's care).

3

DYFS placed Nicini in the foster home of Dennis Armento but Nicini ran away on or before November 2, 1990. After Nicini was located, his aunt, Catherine Livingston, agreed to DYFS's request that Nicini stay with her. On or before December 31, 1990, Nicini ran away once again. Livingston had apparently become ill and DYFS arranged for Nicini to stay with Bonnie Nicini, another aunt. Cyrus then arranged that Nicini be evaluated by a psychiatrist, Dr. Charles Trigiani. Dr. Trigiani was unsure after Nicini'sfirst appointment on January 3, 1991, whether Nicini required inpatient psychiatric care but agreed to recommend Nicini's evaluation at JFK. On January 10, 1991, Cyrus informed Nicini's mother of Dr. Trigiani's recommendation and requested that she bring Nicini to JFK.

What happened thereafter is not clear from the record or the appendices submitted with the parties' briefs, but apparently Nicini was not admitted to JFK at that time. However, a DYFS report dated January 30, 1991 notes that Nicini was at JFK Hospital with an infected hand and might require admission to treat the infection. Bonnie Nicini reportedly stated that the plan was to hospitalize Nicini for depression. The report also states that when the hospital sought consent from Nicini's mother for his treatment, she refused and claimed he was in DYFS custody. At some point thereafter, Nicini was transferred to JFK's psychiatric unit for evaluation. On February 5, 1991, DYFS learned that Nicini had run away from the psychiatric unit after JFK recommended the possibility of admitting Nicini to treat his depression.

Nicini ran to the home of Edward and Dolores Morra in Cherry Hill, New Jersey. Nicini's older brother Danny had gone to school with their children and had stayed with them while experiencing similar family problems. On February 9, 1991, the police notified DYFS that they had located Nicini at the Morra home. According to a DYFS incident report, Nicini had been taken to JFK but was "ready for discharge." Ex. at 72. A DYFS caseworker (not Cyrus) contacted Catherine Livingston, who stated that she had known Nicini was at the Morra home and that she would not permit him to return to her home. The caseworker then spoke to Nicini's father, who expressed his

4

belief that the Morras were "not [a] good placement but [who] agreed to weekend placement." Ex. 69 (emphasis in original). After being given the option of taking Nicini home or locating a relative with whom Nicini could stay, Nicini's father told the caseworker to speak to Livingston. She, of course, had already refused to take Nicini back.

The caseworker then permitted Nicini, who "was refusing to go anywhere else," Ex. at 69, to return to the Morra home that day, Saturday, February 9, 1991. The incident report states that "Frank Cyrus will contact [the Morras] on Monday [February 11]." Ex. at 70.

Between February 9, 1991 and February 28, 1991, Cyrus visited Nicini twice at the Morra home. He also had telephone contacts with Nicini and the Morras. App. at 226.3 Cyrus's first visit was apparently on Monday, February 11, 1991. App. at 250 (expert report). It was Cyrus's overall impression that "everything was positive," App. at 226-27, and that everything "point[ed] towards [Nicini] doing well there and becoming stabilized and progressing . . . ," App. at 228. Additionally, a counselor from an outreach center visited Nicini once a week at the Morra home. During that same time period, Cyrus performed a perpetrator ("PERP") check on the Morras, which would have revealed any criminal record of sexual abuse in the state of New Jersey, including any reports of such abuse to DYFS. The PERP check revealed nothing.

Cyrus interviewed the Morras during a home visit. He did not remember asking whether they had ever had any contact with any law enforcement agency but he recalled asking Edward Morra if anything would prevent him from becoming a foster parent, and Morra replied in the negative.

On February 28, 1991, Nicini appeared at a hearing before the Honorable Vincent D. Segal in the Family Part of

_____

3. The statements in this and the following paragraph are taken from Cyrus's deposition. Only some portions of that testimony have been provided to us; others are summarized in the report of Dr. Eliot Atkins, a forensic psychologist retained by Nicini in this litigation. We designate
the latter by "expert report." Neither party has suggested that Dr. Atkins's summary is inaccurate in this respect.

the Chancery Division of the Superior Court of New Jersey. Although the record does not make clear the purpose of the hearing, the proceedings were apparently related both to certain criminal conduct by Nicini and to where he should be placed. As a result of the hearing, Judge Segal sentenced Nicini to two years probation and also concluded that Nicini should remain with the Morras.

Cyrus was present and testified at the hearing along with Nicini, Nicini's mother, and Catherine Livingston, Nicini's aunt. Also present were the Assistant Prosecutor for Camden County, New Jersey, and Ronald DeSimone, an attorney representing Nicini. Cyrus informed the court of Nicini's prior placements and that Nicini:

> is currently with a friend and the family, the Morra family.4 He's not with a foster family. Tony was with the foster family initially, Mr. Dennis Armento, and he left the home unofficially . . . .
>
> . . . .
>
> Tony found his way to the Morras, who I guess was a friend of his. The Morras indicated they would -- they knew him, they liked him and they wouldn't mind him staying there. He's been there now for a couple of weeks. They have indicated that he's doing very well there, no problems. But that is not an official foster home, that's an unofficial home.

App. at 154-55.

In response to the court's query whether the Morras would qualify as para-foster parents, Cyrus stated:

> Yes they would, your Honor. We've -- so far the only thing I've done is a perp check, perpetrator check, and there's nothing that's come up. There's no -- nothing we've seen in terms of any problem with the law. Although I think, and Mrs. Nicini can speak for herself, I think she has some objections about it on a full time basis. But the family seems to show an interest

_____

4. The Morras are referred to throughout the transcript of the hearing as the Moores, which, we presume, reflects an error in transcription. We have therefore substituted the correct name.

6

towards Tony, they have said they wouldn't mind keeping him -- keeping him on a temporary basis. He has been stable since he's been with them. But like I say that's -- right now they are not an official foster family, although I'm sure they would -- they would apply for para-foster custody if the parents are willing to let them.

App. at 156-57.

When Judge Segal asked Nicini's mother for her comments, she stated as to the Morras:

[T]hey have harbored my oldest son on several occasions when he had taken off . . . . I don't know them personally, only -- only what I had heard. My oldest daughter knows -- goes to school with kids that are friends with Eric Morra, their son, which I believe is 16 or 17, and I've been told that he's into drugs. I don't know if it's true or not, but it's just what I've heard. I don't know, something just seems strange about these people, why they would -- if they don't know Tony, why they would even take him in.

App. at 158.

Nicini's attorney suggested to the court, in light of these concerns, that Nicini "should also be monitored for drugs periodically and -- and maybe something should be looked in with this Morra family, in light of what Mrs. Nicini had said I think maybe a closer investigation on whether or not that's an appropriate placement . . . ." App. at 163.

Nicini's own testimony regarding his stay with the Morras was positive. After recounting the difficulties he experienced with his parents and with his prior placements, Nicini described his relationship with the Morras:

I don't love them or anything, but they're people I can talk to. I mean ever since I been there almost every night I've been up talking to Mr. Morra, his name is Ed. I've been up most of the time talking to him about how I feel about my parents and the way I've been living and how I've been treated and all.

App. at 164. Nicini also told Judge Segal that the Morras were tutoring him until he was re-enrolled in school.

7

Judge Segal then summarized the history of physical abuse at the hands of Nicini's father and summarized a report prepared by Nicini's outreach counselor (not Cyrus), which stated that Nicini was no longer suicidal and had made a "fine adjustment to the location where he's presently located." App. at 166. Judge Segal ruled that Nicini would "come[ ] under the care and supervision" of DYFS, that he would remain with the Morras "for so long as [DYFS] thinks that's an appropriate placement," App. at 167, and that "[u]nder no circumstances is[DYFS] to return the boy to the home of his parents without the authority of the Court," App. at 169. Judge Segal specifically declined to order drug monitoring despite the request of Nicini's attorney because there was no indication that drugs were involved in the matter.

The record is once again sparse regarding the time period after the February 28, 1991 Family Court hearing. On March 11, 1991, less than two weeks after the hearing, Cyrus forwarded to the Morras an application to become para-foster parents. The para-foster application process, as summarized in Cyrus's letter to the Morras, requires completion of an application form, a financial statement, an authorization for release of information, a police reference form, and an agreement between the state of New Jersey, DYFS, and the foster parent. The applicant must also schedule a visit to DYFS for fingerprinting, and DYFS conducts a Home Study Evaluation. The applicant's fingerprints are used to conduct a National Crime Institute Check (NCIC). The Morras never returned the application, and, as we know from hindsight, there was no opportunity for Cyrus to follow up.

On March 15, 1991, four days after Cyrus sent the application to the Morras, Nicini fled the Morra home. He later told investigators that since the second or third day of his arrival there, Edward Morra had been providing him with drugs and alcohol and assaulting him sexually. Further investigation revealed that Edward Morra had been convicted in New York in 1975 for corrupting the morals of a minor and for distribution of controlled substances to minors.[5] In March 1994, following the events described

_____

5. The record does not reveal the exact nature of Edward Morra's New York conviction. Nicini's brief on appeal characterizes it as corrupting

8

here, Edward Morra was convicted in New Jersey of sexual assault and is currently serving a forty-year state prison term with a period of parole ineligibility of twenty years.

On May 19, 1995, Nicini filed suit in the United States District Court for the District of New Jersey against Edward Morra, the New Jersey Department of Human Services ("DHS"), DYFS, and Cyrus. Nicini alleged a substantive due process violation pursuant to 42 U.S.C. S 1983 and various state tort law violations. In particular, Nicini alleged that Cyrus "had actual and/or constructive knowledge" of objections by Nicini's parents that "awarding custody to defendant, Edward Morra, was inappropriate in that .. . [he] permitted illicit narcotic and alcoholic use by minors at his residence." App. at 136, 137. Nicini also alleged that Cyrus "failed to fully and properly investigate the background of Morra before [placing him] . . . in Morra's care" and that Cyrus "had access to or could have requested an authorization from Morra to conduct a criminal record background check." App. at 137. Nicini further alleged that DHS and DYFS had a policy and practice that "no criminal background check would be conducted of voluntary guardians of children in the custody of defendants if the guardian was a resident of the State of New Jersey." App. at 140.

By order dated May 29, 1996, the District Court dismissed all claims against DHS, DYFS, and Cyrus in his official capacity based on Eleventh Amendment immunity. Although Nicini's complaint did not explicitly seek damages against Cyrus in his individual capacity, the court construed it as stating such a claim. The court held that Cyrus was not entitled to Eleventh Amendment immunity and denied his requests for absolute and qualified immunity on the section 1983 claim. The court also held

_____

the morals of a minor and distributing controlled substances to minors. Nicini's complaint in this action, however, alleges Morra was convicted of sexual abuse of a minor, endangering the welfare of a minor, and distributing illicit drugs to a minor. The District Court's opinion describes Morra's conviction as for endangering the welfare of a child. The precise nature of Morra's conviction is irrelevant to the result we reach.

that Cyrus's request for immunity under New Jersey law as to Nicini's state law claims was premature.

After discovery, Cyrus moved for summary judgment. In support, he submitted an affidavit in which he stated that he conducted a PERP check with the DYFS Central registry as required by DYFS policy when a child is in a home which is not a DYFS placement, that the PERP check revealed no criminal information regarding the Morras, and that a more complete criminal background check was unavailable to him at that time. Nicini filed no counter affidavit with respect to those averments.

In an order dated October 29, 1997, the District Court granted summary judgment for Cyrus, holding that Nicini had failed to establish a constitutional violation and that his state law claims were barred by qualified immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. The court found, inter alia, that "DYFS policies only require a PERP check of families not associated with the state foster care program, and Cyrus conducted such a check." Nicini v. Morra, Civ. No. 95-2303, slip op. at 13 (D.N.J. Oct. 29, 1997) [hereafter "Slip op"]. The court held that the facts adduced by Nicini, even when viewed most favorably to him, failed to demonstrate that Cyrus "knew or suspected the threat of sexual abuse which awaited plaintiff in the Morra home." Slip op. at 15. The court held that, at most, Cyrus was negligent and that negligence was insufficient to establish section 1983 liability or to defeat the New Jersey statutory immunity.

Nicini's claims against Edward Morra proceeded and, on February 11, 1998, the court granted Nicini's motion for a default judgment against Morra. The case was then referred to a Magistrate Judge to conduct a hearing to determine the amount of Nicini's damages. In an order dated March 6, 1998, the Magistrate Judge entered judgment by default against Morra and awarded Nicini $500,000 in compensatory and $500,000 in punitive damages. The Magistrate Judge, pursuant to the District Court's orders of May 29, 1996 and October 29, 1997, also entered judgment in favor of the other defendants.

Nicini appealed from the order of March 6, 1998. Although his notice of appeal stated his intent to challenge

the court's May 29, 1996 order dismissing the claims against DHS, DYFS, and Cyrus in his official capacity, as well as the court's October 29, 1997 order granting summary judgment in favor of Cyrus in his individual capacity, Nicini has limited his challenge before us to the latter order. We have jurisdiction to review thefinal order of the District Court pursuant to 28 U.S.C. S 1291.

II.

STANDARD OF REVIEW

We review an order granting summary judgment de novo, applying the same standard used by the District Court. See Sheet Metal Workers' Int'l Assoc. Local 19 v. Herre Bros., Inc., 201 F.3d 231, 239 (3d Cir. 1999). We may affirm the District Court on any grounds supported by the record. See Hedges v. Musco, 204 F.3d 109, 116 (3d Cir. 1999). Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In conducting our review, we view the record in the light most favorable to Nicini and draw all reasonable inferences in his favor.

III.

NICINI'S SECTION 1983 CLAIM

To establish a claim under 42 U.S.C. S 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law. See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). The first step in evaluating a section 1983 claim is to "identify the exact contours of the underlying right said to have been violated" and to determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

11

Nicini's section 1983 claim rests on the Due Process Clause of the Fourteenth Amendment. He invokes the substantive component of due process, which "protects individual liberty against `certain government actions regardless of the fairness of the procedures used to implement them.' " Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). Specifically, Nicini alleges that Cyrus, acting under color of state law, deprived him of "the right to be free from the infliction of unnecessary pain or abuse . . . and the fundamental right to physical safety." App. at 52 (Nicini's brief in opposition to summary judgment).

In denying Cyrus's request for qualified immunity on that claim, the District Court interpreted Nicini to assert a right "to be free from deprivation of liberty by reason of a foster care placement preceded by an investigation so lacking in thoroughness and precision that it can be said to shock the conscience," and held that such a right was clearly established at the time of Cyrus's alleged violation. App. at 95. Indeed, Cyrus does not dispute that the rights Nicini asserts are protectable under section 1983. Cf. DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195 (1989) (right to " `free[dom] from . . . unjustified intrusions on personal security' ") (quoting Ingraham v. Wright, 430 U.S. 651, 673 (1977)). Nor does Cyrus dispute that he was acting under color of state law. He contends, however, that Nicini has not established a constitutional violation because "[t]here is no way that Mr. Cyrus should or could have known about the tragic events that would occur at the Morra home." Appellee's Br. at 13. Nicini replies that Cyrus violated his constitutional rights by "fail[ing] to conduct a full and complete investigation of Morra . . . ." Appellant's Br. at 16. Nicini's argument relies on the principle that "a state's role in `placing children in foster homes' gives rise to a constitutional right of protection to the child . . . ." Appellant's Br. at 13. Although Cyrus does not contest that proposition, we must first determine whether this principle is valid, an open question in this circuit.

A.

As a general proposition, a state's failure to protect an individual against private violence does not constitute a

12

violation of due process. DeShaney, 489 U.S. at 202. Thus, in DeShaney the Court held that a child who was beaten so severely by his father that he suffered permanent brain damage did not have a claim against the state agency for violation of his substantive due process rights by failing to remove him from his father's custody although agency personnel had reason to know of the abuse. However, the Court recognized that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198. As examples of situations in which the state has such a duty, the Court cited its decision in Estelle v. Gamble, 429 U.S. 97 (1976), which held that the Eighth Amendment's prohibition against cruel and unusual punishment required the state "to provide adequate medical care to incarcerated prisoners," DeShaney, 489 U.S. at 198, and Youngberg v. Romeo, 457 U.S. 307 (1982), which held that substantive due process "requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their `reasonable safety' from themselves and others," DeShaney, 489 U.S. at 199 (citation omitted).

The state's affirmative "dut[y] of care and protection," id. at 198, in those cases stemmed "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200. In holding that the state did not have such a "special relationship" with Joshua DeShaney, the Court explained that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." Id.  at 201.6

_____

6. Courts have seized upon this language in DeShaney to fashion another exception to the general rule absolving state actors of liability for
harm caused by private parties: the state-created danger theory. This theory is "predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger" rather than upon a special relationship between the state and the victim. D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). Nicini has not argued in this case that we should apply the state-created danger theory. Rather, he has proceeded solely under the "special relationship" theory.

Of particular significance to the matter before us, the Court also suggested that "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." Id. at 201 n.9. The Court noted that several courts of appeals had already found such a duty in the foster care context but declined to comment on the merit of those decisions. See id. (citing Doe v. New York City Dep't of Social Servs., 649 F.2d 134 (2d Cir. 1981); Taylor v. Ledbetter, 818 F.2d 791 (11th Cir. 1987) (en banc)).

After DeShaney, many of our sister courts of appeals held that foster children have a substantive due process right to be free from harm at the hands of state-regulated foster parents. See, e.g., Lintz v. Skipski, 25 F.3d 304, 305 (6th Cir. 1994); Norfleet v. Arkansas Dep't of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993); Yvonne L. v. New Mexico Dep't of Human Servs., 959 F.2d 883, 891-93 (10th Cir. 1992); K.H. v. Morgan, 914 F.2d 846, 848-49 (7th Cir. 1990). These courts have accepted the analogy between persons the state places in foster care and those it incarcerates or institutionalizes. See, e.g., K.H., 914 F.2d at 849 ("Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping . . ."); Yvonne L., 959 F.2d at 891-93 (discussing and approving cases imposing liability in foster care context).

We have suggested, although never directly held, that state actors owe a duty to children placed in foster care. In D.R., 972 F.2d at 1368-73, we held that a public high school student who was allegedly sexually molested by other students during school hours could not maintain a claim against school officials based on a "special relationship" theory. We held that public high school students were not comparable to prisoners or the involuntarily committed because "parents remain the [students'] primary caretakers," id. at 1371, and because students "may turn to persons unrelated to the state for help on a daily basis," id. at 1372. We also noted that this court has principally read DeShaney as "setting out a test

14

of physical custody." Id. at 1370. For this proposition, we cited our decisions in Philadelphia Police & Fire Association for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 168 (3d Cir. 1989) (refusing to apply the special relationship exception to impose upon the state an affirmative duty "to protect the mentally retarded living at home"), and Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459 (3d Cir. 1990) (entity that performed mental health intake services for the county and which referred plaintiffs' mentally retarded adult son owed him no affirmative duty of care because his parents voluntarily placed him in the institution and were free to remove him).

In D.R., we recognized that "some courts have imposed a constitutional duty to protect foster children by analogy to involuntarily institutionalized individuals," 972 F.2d at 1372, and stated, albeit in dictum:

> A relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families. By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being. In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs.

Id. (citations omitted); see also Horton v. Flenory, 889 F.2d 454, 457 (3d Cir. 1989) (holding that DeShaney is limited "to situations in which the state is not involved in the harm, either as a custodian or as an actor" and that plaintiff was functionally in state custody where he was forcibly detained and beaten by bar owner, with police approval).

We find our discussion in D.R. and the numerous decisions of the other courts of appeals on this issue persuasive. Foster children, like the incarcerated or the involuntarily committed, are "placed . . . in a custodial environment . . . [and are] unable to seek alternative living arrangements." Taylor v. Ledbetter, 818 F.2d 791, 795 (11th Cir. 1987) (en banc). We now hold that when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child

15

which imposes upon it certain affirmative duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983.

We recognize that the analogy between foster children on the one hand and prisoners and institutionalized persons on the other is incomplete. For example, foster children, especially older ones, enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety. Nonetheless, any distinctions between children placed in foster care and the prisoners at issue in Estelle or the institutionalized mentally retarded persons at issue in Youngberg are matters of degree rather than of kind. See Norfleet, 989 F.2d at 292 (although there is a closer relationship between the state and prisoners than between the state and foster children, "the situations are sufficiently analogous"). In each of these cases the state, by affirmative act, renders the individual substantially "dependent upon the state . . . to meet [his or her] basic needs." D.R., 972 F.2d at 1372.

We are aware that Nicini came to stay with the Morras on his own initiative and that the Morras were not officially approved by the state as either foster or para-foster parents.7
_____

7. The parties' briefs are silent as to the precise meaning of "foster" and "para-foster" care. At argument, we were informed that foster parents are approved for the general placement of foster children rather than approved for the placement of a particular child. See also N.J. Admin. Code tit. 10, S 122B-1.4 (DYFS regulations defining foster parent as "any person approved by the Division for the general placement of children in his or her own home").

"Para-foster" care is not defined in the statute or regulations governing DYFS. The current regulations, however, refer to "para care," defined as "a service involving the placement of a child in a private family home by anyone other than DYFS, and which DYFS approves for payment after an approval process is completed." N.J. Admin. Code tit. 10, S 10:15-1.2. This is similar to a definition of "para-foster care," effective March 9, 1987, contained in a DYFS Field Operations manual submitted to us as part of the appendix in this appeal which refers to "foster care service involving the placement of a child in a private family home by anyone other than DYFS, regardless of whether the child is already under DYFS

16

However, Cyrus does not contest that Nicini was in DYFS custody throughout the relevant period. Furthermore, the record is replete with evidence that Nicini was substantially dependent upon DYFS and that DYFS acquiesced in Nicini's stay at the Morra home. At least by October 10, 1990, when Nicini's father signed a foster care placement agreement, DYFS was able to arrange for his foster placement. At some point, the Superior Court of New Jersey awarded custody of Nicini to DYFS and DHS. App. at 136. Nicini was thereafter placed on several occasions with DYFS-approved foster parents and with relatives. It also appears that after the police located Nicini at the Morra home and took him to JFK, DYFS returned him to their home over the objections of his aunt and his father. 8 Under these facts, we believe Nicini's situation is sufficiently analogous to a foster care placement to fall within the "special relationship" exception to DeShaney.

B.

Having established that Nicini has alleged a protected interest and a sufficient relationship with the state to state a cause of action under section 1983, we turn to the District Court's determination that summary judgment was appropriate because Cyrus's actions did not amount to a

_____

supervision, and which DYFS approves for payment after an approval process is completed." App. at 171. Unlike foster parents, para-foster parents are "approved by DYFS for the income maintenance and services to [a] particular child and not for the placement of other foster children."
Id. Nicini does not suggest that DYFS was precluded from approving his stay with the Morras if they were neither foster parents or para-foster parents.

8. Livingston seems to have objected on the ground that Nicini "was a sick boy who needed hospitalization." Ex. at 67. The DYFS incident report that documents the objection of Nicini's father does not contain the basis for his objection (he apparently testified at his deposition that
he informed a DYFS caseworker named Diana Smith of his belief that the Morra home was a "haven for runaway juveniles," App. at 250 (expert report)), but it clearly states that he agreed to weekend placement
with the Morras. The same report states that DYFS had "custody of Anthony through court order." Ex. at 70.

17

violation of Nicini's constitutional rights. We mustfirst determine what level of conduct is egregious enough to amount to a constitutional violation and, then, whether there is sufficient evidence that Cyrus's conduct rose to that level.

We begin with the decision in County of Sacramento v. Lewis, 523 U.S. 833 (1998), where the Supreme Court granted certiorari "to resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case." Id. at 839. In Lewis , the Court emphasized that " `[t]he touchstone of due process is protection of the individual against arbitrary action of government.' " Lewis, 523 U.S. at 845 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). It then noted that where the challenge is to executive rather than legislative action, "only the most egregious official conduct can be said to be `arbitrary in the constitutional sense.' " Id. at 846 (quoting Collins v. Harker Heights, 503 U.S. 115, 129 (1992)). Mere negligence is never sufficient for substantive due process liability. See Daniels v. Williams, 474 U.S. 327 (1986). Under Lewis, substantive due process liability attaches only to executive action that is "so ill-conceived or malicious that it `shocks the conscience.' " Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999) (quoting Lewis, 523 U.S. at 846).

The "exact degree of wrongfulness necessary to reach the `conscience-shocking level depends upon the circumstances of a particular case.' " Id.  at 375. At issue in Lewis was the conduct of police officers engaged in a pursuit, which the Court contrasted with the conduct of prison officials who face liability under the Eighth Amendment if they are "deliberately indifferent to the medical needs of their prisoners." Lewis, 523 U.S. at 850 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The Court noted that "[a]s the very term `deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical," and "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory." Id. at 851. The Court also noted that " `the State's responsibility to attend to the medical needs of prisoners . . . does not ordinarily clash

18

with other equally important governmental responsibilities.' " Id. at 851-52 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).

In the police pursuit context, the issue presented in Lewis, officers do not have "the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." Id. at 853. It followed that "high speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." Id. at 854. The Court recognized, however, that in some contexts conduct falling within a middle range of culpability -- that is, involving more than negligence but less than intentional conduct -- can be shocking in the constitutional sense. As the Court explained:

> Rules of due process are not . . . subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . .

Id. at 850.

Lewis therefore makes clear that a plaintiff seeking to establish a constitutional violation must demonstrate that the official's conduct "shocks the conscience" in the particular setting in which that conduct occurred. In some circumstances, conduct that is deliberately indifferent will shock the conscience. Indeed, in the foster care context, most of the courts of appeals have applied the deliberate indifference standard, although they have defined that standard in slightly different ways. See, e.g., White v. Chambliss, 112 F.3d 731, 737 (4th Cir. 1997) (liability if defendant was "plainly placed on notice of a danger and chose to ignore the danger"); Taylor, 818 F.2d at 796 (foster child must show "actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home"); Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 145 (2d Cir. 1981) (deliberate indifference "cannot exist absent some knowledge triggering an affirmative duty to act . . . . Defendants may be held liable [for] . . . deliberate indifference to a known injury, a known risk, or a specific duty").

19

In Miller, we evaluated the actions of a social worker who after receiving allegations of abuse separated a child from her natural parent under a standard that "exceed[ed] . . . deliberate indifference." Miller, 174 F.3d at 375. We held that the worker would be liable only if his conduct reached "a level of gross negligence or arbitrariness that indeed shocks the conscience." Id. at 375-76 (quotation omitted). We also stressed that although "a social worker acting to separate parent and child does not usually act in the hyperpressurized environment of a prison riot or a high speed chase . . ., he or she rarely will have the luxury of proceeding in a deliberate fashion." Id. at 375. Cyrus, unlike the social worker in Miller, had time "to make unhurried judgments" in investigating whether to permit Nicini to remain with the Morras. Lewis, 523 U.S. at 853. In the context of this case, we agree that Cyrus's actions in investigating the Morra home should be judged under the deliberate indifference standard.9

In Farmer v. Brennan, 511 U.S. 825 (1994), the Court clarified the deliberate indifference standard applicable in suits challenging prison conditions under the Eighth Amendment. It adopted a subjective standard of liability consistent with recklessness as that term is defined in

_____

9. We note that in Youngberg, the Supreme Court held that "professional" decisionmakers would be liable for violating the substantive due process rights of an involuntarily institutionalized mentally retarded plaintiff if their conduct was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323. We applied this test on facts virtually identical to those in Youngberg in Shaw v. Strackhouse, 920 F.2d 1135, 1142-46 (3d Cir. 1990). See also Winston v. Children & Youth Servs., 948 F.2d 1380, 1390-91 (3d Cir. 1991) (applying standard to challenge by natural parents to policy granting visitation rights to children in foster care); Yvonne L., 959 F.2d at 893-94 (Eleventh Circuit applied the professional judgment test in the foster care context, but emphasized test is essentially same as deliberate indifference test).

In response to our inquiry, neither Nicini nor Cyrus suggested that the professional judgment standard is appropriate. Therefore, we do not decide whether, consistent with Lewis, that standard could be applied to Cyrus's conduct.

20

criminal law. The Court held that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

This case does not require us to determine whether an official's failure to act in light of a risk of which the official should have known, as opposed to failure to act in light of an actually known risk, constitutes deliberately indifferent conduct in this setting.10 We will assume arguendo that Nicini's proposed standard of "should have known" is applicable. Nevertheless, as Lewis makes clear, the relevant inquiry is whether the defendant's conduct "shocks the conscience."

Under the circumstances of this case, we cannot agree that Cyrus's conduct meets that standard. To the contrary, we conclude that Cyrus's conduct in investigating the Morras amounted, at most, to negligence. For the same reason, we need not consider whether failure to perform a

_____

10. We recognize that the deliberate indifference standard applicable in Farmer to challenges to prison conditions does not necessarily apply to the substantive due process claims of a foster child. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983) (pretrial detainees entitled under due process to "at least as great" protection as is afforded convicted prisoners under the Eighth Amendment); Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 906-08 (8th Cir. 1999) (declining to decide whether pretrial detainee's claim should be judged by Farmer's subjective deliberate indifference standard or by objective standard); cf. Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987) (suggesting that "[t]o apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous"). Nevertheless, we note that after Farmer the courts of appeals have shown a tendency to apply a purely subjective deliberate indifference standard outside the Eighth Amendment context. See, e.g., Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 141 n.6 (2d Cir. 1999) (rejecting "should have known" standard in due process action challenging conduct of school officials and other defendants in responding to complaints of racial harassment against student); Qian v. Kautz, 168 F.3d 949, 955-56 (7th Cir. 1999) (detainee's due process claims judged by Farmer standard); Hare v. City of Corinth, Miss., 74 F.3d 633, 648 (5th Cir. 1996) (same).

21

specific duty can ever amount to deliberate indifference, see Taylor, 818 F.2d at 797; Doe, 649 F.2d at 145, as there is no evidence that Cyrus failed to perform any required duty.

C.

The District Court held that the evidence, viewed most favorably to Nicini, failed to establish that Cyrus's conduct was "deliberately indifferent" to Nicini's rights. The court held that Nicini "fail[ed] to establish that Cyrus knew or suspected the danger that awaited [Nicini] in the Morra home," slip op. at 12, and that "by following standard DYFS procedures and informing a family court judge of the scope of his investigation, Cyrus's failure to discover that conviction does not shock the conscience or demonstrate his deliberate indifference to or reckless disregard of [Nicini's] constitutional rights," id. at 13.

On appeal, Nicini contends that the District Court too narrowly construed Cyrus's responsibility by looking to whether Cyrus knew or suspected that Morra had a history of abusing children rather than whether Cyrus knew or suspected that the placement was unsafe. In its opinion granting summary judgment, the District Court stated the exclusive focus of the complaint involved Cyrus's failure to discover Morra's criminal background. Slip op. at 9. Even if we accept Nicini's broader view of the complaint, it would not change the outcome of the appeal, which still revolves around whether Cyrus was deliberately indifferent in any respect.

In his affidavit, Cyrus stated:

> The DYFS policies and procedures required that I conduct a perpretrator [sic] "PERP" check with the DYFS Central Registry when a child ends up at a home which is not a DYFS placement. I conducted one. The PERP check revealed no criminal information regarding the Morras. DYFS can not access National Crime Institute Check ("NCIC") . . . nor a State criminal background check.

App. at 145. Nicini does not argue that Cyrus failed to act in accordance with applicable DYFS policy and procedure.

22

To establish Cyrus's liability, Nicini offered only the report of Dr. Atkins, the psychologist he proffered as an expert, that Cyrus should have done more than was required of him by DYFS's practices and procedures. The relevant portion of that report states:

> In light of the information available to Frank Cyrus at the time of his investigation of the Morra household, particularly the criminal record of Morra which was a matter of public record and which could have been obtained by an appropriate national police record search with the permission of Morra being required by Cyrus prior to placement, it is the opinion of this clinician that this investigation was conducted with total indifference to all available facts that were clearly material to any social worker who would be called upon to make such a placement.

App. at 253. As is evident, Dr. Atkins believed that Cyrus should have undertaken a national police search (which the psychologist recognized required Morra's consent) even though the Morras were not applicants to become an official DYFS foster family or para-foster family. Dr. Atkins never explained how Cyrus could have performed what the psychologist termed the "appropriate national police record search" without Morra's cooperation and never responded to Cyrus's sworn statement that he could not access the National Crime Information Center.

Unable to point to a state requirement or a DYFS policy or procedure violated by Cyrus, Nicini argues that Cyrus nonetheless should have been on notice that a more detailed investigation of the Morras was required. As to the period from the date DYFS learned where Nicini was, February 9, 1991, and the date of the Family Court hearing that approved Nicini's temporary placement status, February 28, 1991, the record reveals consistent monitoring and oversight by Cyrus and DYFS. On February 9, Nicini was located at the Morra home and, after being taken to JFK, "was refusing to go anywhere else" than back to the Morra home. Ex. at 69. On that day, a DYFS caseworker visited with the Morras and made detailed notes about the condition of the home and the Morra family's willingness "to help Tony." Ex. at 69. Cyrus visited Nicini

23

twice during the following nineteen days and also made contact by telephone during that period. An outreach counselor also visited Nicini once a week and filed a report that supported Cyrus's testimony at the February 28 hearing that Nicini appeared to be doing well there.

Nicini did not tell Cyrus of the sexual assaults during the visits Cyrus made with him or during the phone conversations Cyrus made to him while he was at the Morra home, although the assaults began within two or three days of Nicini's arrival there. Nicini, albeit a minor, was not of such tender years that he was unable to communicate this information. He was fifteen years old and had left an earlier placement to find the Morras on his own. Significantly, although Nicini testified at the February 28, 1991 hearing he did not inform the court of the assaults. Nor, apparently, did he inform his attorney, who likewise mentioned nothing of the assaults at the hearing. Thus, the record reveals little from which Cyrus could have inferred that Nicini faced a "substantial risk of serious harm." Farmer, 511 U.S. at 837.

Nicini relies on two factual bases for imposition of liability on Cyrus. He points to Cyrus's testimony at the February 28 hearing that there was nothing the agency saw "in terms of problems with the law." App. at 156.11 There is nothing in the record to support Nicini's argument that Cyrus made an affirmative representation that he"checked out" Morra. The record reflects that Cyrus was frank and forthright as to the extent of his inquiry into the appropriateness of the Morra home. He advised the judge that he had done a PERP check and advised what that check disclosed. There is no suggestion that the judge was unaware of the extent of investigation that the PERP check entailed, as it appears this is a routine investigation. Cyrus

_____

11. We have held that caseworkers are entitled to absolute immunity "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings. Their immunity is broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings." Ernst v. Child & Youth Servs. of Chester County, 108 F.3d 486, 495 (3d Cir. 1997); see also Miller, 174 F.3d at 376 n.6 (immunity does not extend to investigative or administrative acts).

testified that the Morras were not a foster care family but that Nicini needed a stable environment before DYFS could attempt to resolve the larger family problems. When the court asked whether the Morras would qualify as para-foster parents, Cyrus responded that they would but cautioned that he had only completed the PERP check.

The other basis for Nicini's claim against Cyrus is that he was "placed on notice" about the Morra home by the allegations of Nicini's mother. However, Cyrus alerted the judge to the fact that Nicini's mother objected to placement with the Morras. When the judge asked Mrs. Nicini for her views, she informed him of reports that the Morras' son took drugs and that "something just seems strange about these people" in light of their willingness to take an unknown child into their home. App. at 158. Mrs. Nicini voiced concern and suspicion but never made any more specific allegations, and did not advise Judge Segal of all of her concerns when she had the opportunity to do so. 12

Nicini argues that Cyrus should have elicited alcohol and substance abuse through a urine analysis. But Nicini completely ignores the fact that the judge heard Mrs. Nicini's objections and expressly declined to require drug monitoring as requested by Nicini's attorney because there was "no indication that drugs are involved in this matter." App. at 168. The judge then approved placement of Nicini at the Morra home, specifically holding that Nicini would "come[ ] under the care and supervision" of DYFS and that he would remain at the Morras as long as DYFS thought it "appropriate." App. at 167. Nicini points to nothing else in

_____

12. In her deposition taken in this case years after the events, Nicini's mother described the "objections" to which Cyrus referred at the hearing. She testified that she spoke to Cyrus prior to the hearing on February 28, 1991 and told him of a cassette that contained a message from Nicini in which Nicini said he was "partying and having a good time over there drinking" at the Morras. App. at 250 (expert report). Nicini's mother also testified that she expressed "other concerns about the drinking and the drug use that I felt went on over there, about the juveniles that hung around over there . . . . I expressed a lot of concerns
to him about the Morra home and Tony's placement." Id. Nicini makes no effort in his brief to explain his mother's failure to discuss these allegations in more detail at the hearing.

the post-hearing period that should have put Cyrus or DYFS on notice that continued placement with the Morras was inappropriate.

In her vigorous dissent, our colleague would have us second-guess Cyrus's actions from hindsight. That is not our task. Nor is it called for in the circumstances of this case. The dissent relies heavily on the report by Dr. Atkins to assert that despite his compliance with DYFS policies Cyrus should be liable for failing to engage in a"heightened level of inquiry, interview and investigation." Dissenting Op. at 33. But Dr. Atkins, who never interviewed the persons involved, focuses "particularly" on Cyrus's failure to obtain Morra's consent to a criminal background check without pointing to specific facts from which Cyrus should have inferred that such a check was necessary. The fact that Nicini's "problems went well beyond those of the average troubled juvenile" under DYFS care and supervision, Dissenting Op. at 31, furnished Cyrus no clue about the appropriateness vel non of the Morra home as a placement. Given that the only reason Cyrus had to question the appropriateness of the Morra home was the suspicions of Nicini's mother and father,13 Nicini's insistence on remaining at the Morra home, and Cyrus's first-hand impression that Nicini was "doing well there," App. at 155, an impression corroborated by Nicini's TRIS worker and by Nicini himself at the hearing before Judge Segal, a jury could not permissibly conclude that Cyrus's investigation was so inadequate as to manifest deliberate indifference to Nicini's rights.

_____

13. The dissent quotes liberally from the deposition testimony of Nicini's father but fails to mention that Nicini's father did not suggest that he relayed these concerns to Cyrus. Indeed, it is unclear from his deposition whether Nicini's father ever informed anyone he suspected Morra to be a pedophile. When asked for specific details of the concerns he relayed to an unnamed DYFS employee in "1988 give or take a year," App. at 230, Nicini's father replied: "About the placement of children into foster care homes. My concern with my son [Danny] as far as what he was doing. And I was trying to make them understand my form of discipline versus another individual that he may socialize with, their parents." App. at 231.

26

Nor are we persuaded by the cases cited by the dissent in which other courts determined a jury could reasonably find deliberate indifference because the facts in those cases are not analogous to those in this case.14 It may be dramatic to attempt to analogize Cyrus to a caseworker who "allow[s] a child to starve before his eyes," Dissenting Op. at 40 n. 14, but, so far as the record reveals, there was nothing "before [Cyrus's] eyes" that suggested that Nicini faced a substantial risk of serious harm. To the contrary, Nicini's TRIS worker confirmed that while at the Morra home Nicini was no longer suicidal, no longer depressed, and appeared to be adjusting well.

The evidence adduced by Nicini, even when interpreted most favorably to him, not only falls short of the demanding standard for deliberate indifference set forth in Farmer, it also fails to establish that Cyrus was more than negligent, if it even establishes that. The District Court did not err in holding Nicini failed to prove a case for subjecting Cyrus to substantive due process liability. Because the period between the court hearing and Nicini's flight from the Morra home was a limited one, spanning barely over two weeks, we express no view of a caseworker's responsibility over a longer stretch of time.

IV.

Nicini's State Law Claims

We likewise conclude that the District Court did not err in granting summary judgment for Cyrus on Nicini's state tort law claims based on qualified immunity. The District

_____

14. For example, in Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996), the officials knew plaintiff was diabetic, in insulin shock, and in need of immediate hospitalization, but refused to take him there. Similarly, in Chavez v. Cady, 207 F.3d 901 (7th Cir. 2000), there was sufficient evidence that the detainee's need for medical care was obvious to defendants. By contrast, in Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999), cert. denied, 120 S. Ct. 1673 (2000), a case not cited, the court held summary judgment was appropriate despite a report by plaintiff 's expert that further action was necessary, because there was no objective evidence that plaintiff had serious need for medical care.

27

Court noted that "[t]he exact nature of [Nicini's] state law claims against Cyrus is not readily apparent on the face of his complaint," slip op. at 17, but Nicini agrees that the court properly characterized his claims as relying on the "same factual bases . . . which supported the 1983 actions," Appellant's Br. at 18.

Cyrus asserts that he is entitled to immunity under section 59:3-3 of the New Jersey Tort Claims Act, which provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J. Stat. Ann. S 59:3-3. Negligence is insufficient to defeat the immunity provided by section 59:3-3. See Canico v. Hurtado, 144 N.J. 361, 365, 676 A.2d 1083, 1085 (1996) ("A public employee, although negligent, may still act in good faith."). Instead, to overcome immunity under this section, "a plaintiff must prove more than ordinary negligence." Id. Summary judgment under section 59:3-3 is appropriate if a public official establishes that his or her "acts were objectively reasonable or that they performed them with subjective good faith." Id.

Nicini has not argued that Cyrus is ineligible for the immunity provided by this statute, which applies to public officials engaged in the execution or enforcement of the law. Rather, he contends that Cyrus's conduct amounted to "reckless indifference." Appellant's Br. at 19. We have concluded that Cyrus's conduct amounted, at most, to negligence. Therefore, the District Court did not err in granting summary judgment in his favor on the state law claims based on qualified immunity. See B.F. v. DYFS, 296 N.J. Super. 372, 385-86, 686 A.2d 1249, 1256-57 (N.J. Super. 1996) (DYFS employees immune for efforts to terminate parental rights).

V.

For the foregoing reasons, we will affirm the order of the District Court entering judgment in favor of Frank Cyrus.

28

RENDELL, Circuit Judge, dissenting:

The majority engages in an extensive and well-reasoned assessment of the underlying legal principles relevant to the substantive due process standard to be applied in this custodial care setting. Unfortunately for Anthony Nicini, however, the majority does not appear to have considered whether the real-life controversy before us -- whether Frank Cyrus's conduct actually fell below this standard -- should be heard or decided by a jury under the legal principles it espouses. This is because Cyrus was, in the majority's view, merely negligent, and maybe not even that. I dissent because I believe that more than one reasonable inference can be drawn from the facts, including an inference of deliberate indifference that shocks the conscience, making it inappropriate to dispose of Nicini's case on summary judgment. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Having used Nicini's case as a vehicle to explore and analyze a particularly complicated legal standard, have we given short shrift to, and failed to appreciate the complexities of, applying the legal standard to the facts of the case itself? I suggest that we have.

Nicini's story as chronicled by the majority leads neatly to its conclusion that Cyrus was, at most, merely negligent. But there is more than one way to view or perceive what Cyrus did, or failed to do, in furtherance of his duty to Nicini, who, although not of "tender years" as the majority notes, was a suicidal and "high risk" adolescent in need of hospitalization or intensive outpatient care.1 Due process is contextual and due process rules should not be applied mechanically. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 850 (1998); Rochin v. California, 342 U.S. 165, 172 (1952). Although mere negligence is not sufficient to be a substantive due process violation, "culpability falling

_____

1. Even if the majority is correct that, as a general matter, "foster children, particularly older ones, enjoy a greater degree of freedom and are more likely to be able to take steps to ensure their own safety," this assumption is hardly applicable to Nicini, a suicidal and severely depressed victim of physical abuse who repeatedly manifested a tendency to take actions that did not further his own safety and welfare.

29

within the middle range, falling from something more than negligence but `less than intentional conduct, such as recklessness or gross negligence' . . . is a matter for closer calls." Lewis, 523 U.S. at 849 (citation omitted). "[T]he fact that there can be instances where glaring negligence may not constitute deliberate indifference does not mean that a fact finder is barred from equating negligence of a certain dimension with deliberate indifference." Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 143 (2d Cir. 1981). Considering the facts in the light most favorable to Nicini, the non-movant, as we are required to do on summary judgment, it certainly appears possible that Cyrus's conduct might cry out "indifference" to a reasonable jury. Indeed, whether or not a defendant's conduct amounts to deliberate indifference has been described as a "classic issue for the fact finder" and "a factual mainstay of actions under S 1983." Armstrong v. Squadrito, 152 F.3d 564, 577 (7th Cir. 1998). 2

It is hardly a struggle to present the facts in a way that gives rise to an inference of culpability greater than mere negligence. An unrebutted expert report in the record, which receives scant attention in the majority opinion, does

_____

2. Other courts similarly have characterized this question as one for the fact finder when the issue is less than clear-cut. See, e.g., Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996) (reversing grant of summary judgment because a reasonable jury could infer from the record, taken in the light most favorable to the plaintiff, that the defendants were deliberately indifferent); Wood v. Ostrander, 879 F.2d 583, 588 n4 (9th Cir. 1989) (reversing grant of summary judgment because defendant's conduct could be construed to be deliberately indifferent; "a jury presented with these facts might find Ostrander's conduct to have been `deliberately indifferent,' `reckless,' `grossly negligent,' or merely `negligent.' ") (citing Fargo v. City of San Juan Bautista, 857 F.2d 638, 641 (9th Cir. 1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence, or recklessness, the question is one of fact to be decided by the jury.")). The
Supreme Court recently likened section 1983 actions to tort claims for purposes of Seventh Amendment application, and explained that as a general historical matter, juries decided questions of liability, which "preserved the jury's role in resolving what was often the heart of the dispute between plaintiff and defendant." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 718-719 (1999).

much of the work for us. This 13-page, single-spaced report of psychologist Elliott L. Atkins, Ed.D., P.A., provides a detailed account of the facts and opines unequivocally that Cyrus's conduct was far more egregious than the majority suggests is conceivable. I believe that this unrebutted expert opinion evidence by itself can, and does, create a genuine issue of disputed fact sufficient to defeat Cyrus's motion for summary judgment. See Thomas v. Newton Int'l Enters., 42 F.3d 1266, 1270 (9th Cir. 1994). 3 At the very least, however, the Atkins expert report takes us on a guided tour through the record, including DYFS records and Cyrus's own testimony, exposing what Cyrus knew or should have known about Nicini and the Morras and making it glaringly obvious that some investigation was necessary before placing a suicidal teenager in a home where children were permitted to "drink and party."

Atkins focuses first on Nicini's condition and particular needs. Nicini's problems went well beyond those of the average troubled juvenile. As such, Nicini required a heightened level of attention by those charged with responsibility for his care. The DYFS records depict Nicini as the victim of repeated physical abuse at the hands of his

_____

3. See generally Chavez v. Cady, 207 F.3d 901, 905 (7th Cir. 2000) (concluding that a material fact existed as to whether the treatment provided by the defendant was a substantial departure from accepted professional judgment based on the substance of the defendant's expert's testimony); Russo v. City of Cincinnati , 953 F.2d 1036, 1047 (6th
Cir. 1992) (reversing grant of summary judgment in section 1983 action alleging failure to train police officers, and noting that "expert testimony
may prove the sole avenue available to plaintiffs to call into question the
adequacy of a municipality's training procedures. To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting
directly from its indifference to the rights of citizens. Reliance on expert
testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself."). Compare Fagin v. City of Vineland , 22 F.3d 1296, 1307 (3d Cir. 1994) (en banc) (affirming grant of summary judgment in police pursuit case, and noting that the only evidence introduced by the plaintiffs to show arbitrary, intentional, and deliberate action by the defendants was expert witness testimony, but their expert witness"expressly disclaimed any such characterization" of the defendants' conduct).

father. They explain how Nicini made several attempts at suicide and self-harm, including slashing his wrists and stomach, drinking peroxide, and ingesting pills. App. 212-214, 243-244. They reflect that Nicini had both long term and recent problems of such severity as to require intensive outpatient care, or, more likely, hospitalization. A DYFS-paid psychiatrist's report from January 9, 1991-- shortly before Cyrus acquiesced in Nicini's placement with the Morras -- noted that Nicini:

> [I]s actively suicidal, in a major depression, very impulsive and bored. Out-patient treatment is not enough.

App. 245.4 Cyrus's own contact sheet entry stated:

> Worker conferred with supervisor who directed worker to contact Crisis (JFK) for evaluation of Anthony Nicini today. Worker contacted parent (Helen Nicini) and advised her [sic.] recommendations of Dr. Trigiani and parent was asked to pick Anthony up from aunt's home and take him to JFK Crisis – parent agreed to do this. Worker contacted JFK crisis and indicated that Dr. T's evaluation and recommendation would be faxed to them – this was done. Worker advised parent (Helen) upon request of abuse unit that she would have to stay with child in case he needed to be admitted.

App. 222, 245.

Atkins also explains how Nicini escaped through the window of the JFK psychiatric unit, deciding by himself
_____

4. During Nicini's family court hearing, Judge Segal reported on a telephonic report from a TRIS worker who opined that Nicini was no longer depressed or suicidal at that particular time and had "made a fine adjustment to the location where he's presently located," but also mentioned that the "the option of placement in a longer term facility like the residential placement . . . like Ranch Hope is a very good option" and noted that Nicini needed continuing psychotherapy and perhaps anti-depressants "if things do not clear up for him." App. 166-167. Judge Segal also noted that "all the doctor has is an assessment of Tony and he doesn't have a full basis on which to make an evaluation. But he had sufficient information from his assessment to indicate that it will be a long time before this boy goes back home." App. 167.

that he "didn't feel like staying in the hospital." App. 164, 224-225.5 In addition to the medical evidence, Nicini's relatives expressed concerns about Nicini's severe health to DYFS and at the family court hearing, noting that Nicini was not likely to voluntarily succumb to the treatment he desperately needed. App. 160, 246- 247.6

Cyrus acceded in Nicini staying with the Morras in the face of Cyrus's awareness of Nicini's "history of mistreatment, physical abuse, depression, self-destructive behavior and suicidality, as well as his protracted absence from school . . . [and] the long-standing history of rejection, neglect, and abuse." App. 248. Atkins explains that it should have been -- and was -- clear to Cyrus that a caregiver for Nicini needed to provide a secure, emotionally-stable, and supportive environment, and needed to be able to provide skillful and knowledgeable intervention. To determine whether the Morras could provide such an environment and intervention in light of Nicini's high-risk situation likely entails a heightened level of inquiry, interview and investigation.

As Atkins helps to document, however, Cyrus made little or no effort to discover whether the Morra householdfit any of the requisite characteristics. Cyrus failed to address the most basic issues when he interviewed the Morras after Nicini went to their home upon escaping from the hospital. Any information about the Cyrus-Morra interview comes from Cyrus himself because the routine written documentation of such an interview is curiously absent from the DYFS records.7 Cyrus could not recall if he asked the Morras whether they had ever been arrested, convicted,

_____

5. A psychologist at JFK held a bed for Nicini after he ran away, and the police picked up Nicini at the Morra residence, yet Cyrus gave Nicini permission not to go back to the hospital but, rather, to stay at the Morras' home. App. 225, 246.

6. One of Nicini's aunts also stated at the hearing that she believed Nicini had attacked her daughter: "This isn't just something that's happened all of a sudden, it's been going on for at least a year and a half
. . . and he doesn't mean this, he doesn't." App. 161.

7. When asked about this absence, Cyrus said that he remembered "writing something, but I don't know if its in here or not." App. 252.

33

or otherwise had contact with law enforcement, nor did he ask the Morras how long they had lived in New Jersey to gain perspective on the helpfulness of the PERP check, apparently because he "just didn't think to ask them that." App. 251. Instead, Cyrus remembered asking the Morras whether there was anything that would prevent them from becoming foster parents, to which he received a negative response. Cyrus did not ask what the Morras did for a living. He did not ask whether they owned or rented their residence. Cyrus could not even recall with certainty that he had talked to the Morras about Nicini's mental health history. In essence, there hardly was a meaningful investigation, let alone a heightened inquiry, of the Morras' fitness to be Nicini's caregivers. Does it not matter that Cyrus failed to make inquiries fundamental to placing any child, let alone a physically-abused and suicidal teenager in desperate need of a stable environment? Did this conduct merely fall below an acceptable standard, as the majority concludes, or was Cyrus indifferent over a period of several weeks when he should have detected a problem and when he could and should have acted?

Cyrus would have us forgive any weaknesses in his inquiry because "no one knew or even remotely suspected that the Morra home was a dangerous environment," Brief for Appellee at 14, but the undisputed facts belie Cyrus's assertion, at least for purposes of summary judgment. Putting aside whether Cyrus would have had reason to suspect that the Morra home was a dangerous environment had he asked them even one or two more basic questions, both of Nicini's parents relayed express concerns to DYFS about the Morras, and about placing Nicini with the Morras. According to her deposition testimony, Mrs. Nicini had told Cyrus prior to the family court hearing about an answering machine cassette tape with a message to Nicini's aunt from Nicini saying that he is "partying and having a good time over there drinking" at the Morra residence. App. 250. Mrs. Nicini says she also made Cyrus aware in advance of the family court hearing about:

> [M]y other concerns about the drinking and the drug use that I felt went on over there, about the juveniles that hung around over there, young kids all hours of

34

the night and how Danny used to come home from that place. I expressed a lot of concerns to him about the Morra home and Tony's placement.

App. 250. Mrs. Nicini explained some of her concerns at the family court hearing:

> And now these people that he's with now, the Morras, they have harbored my oldest son on several occasions when he had taken off, and at one point even have had their house surrounded and went in and got him. Now maybe he didn't tell these people that he was runaway or anything. I don't know them personally, only-- only what I had heard. My oldest daughter knows -- goes to school with kids that are friends with Eric Morra, their son, which I believe is 16 or 17, and I've been told that he's into drugs. I don't know if it's true or not, but it's just what I've heard. I don't know, something just seems strange about these people, why they would-- if they don't know Tony, why they would even take him in. I'm sure that Tony knows them through my oldest son Danny.

App. 158-159. In light of Mrs. Nicini's concerns, Nicini's counsel commented that "maybe something should be looked in [sic.] with this Morra family, in light of what Mrs. Nicini had said I think maybe a closer investigation on whether or not that's an appropriate placement for Anthony." App. 163.

At the hearing, Cyrus acknowledged the existence of Mrs. Nicini's objections, but was somewhat dismissive, instead emphasizing that the Morras had an interest in Nicini and would not mind having him there, and that Nicini was stable at the Morra home. App. 155-156.8  In any event, the information provided by Mrs. Nicini to Cyrus prior to the family court hearing apparently did not make a lasting impression on Cyrus, as he could not articulate her concerns about the Morras at his deposition:

_____

8. Indeed, it appears that Cyrus may have characterized the Morras as a friend of the Nicini family, although it is not entirely clear due to a possible error in transcription. See App. 154, lines 13-14. See also App. 155 (Cyrus explaining that Nicini "found his way to the Morras, who I guess was a friend of his.").

35

> [I]t seems like it is more like something that she had heard about him or heard about the family or something like that, but I don't know any specifics.

App. 250.

Mr. Nicini had expressed concerns to DYFS about the Morras as well. According to the deposition testimony of Nicini's father, as recounted by Atkins, Mr. Nicini told DYFS that the Morra home was a "haven for runaway juveniles." App. 250. DYFS records indicate that Mr. Nicini said the Morra home was not a good placement, although he would agree to weekend placement.[9] According to Mr. Nicini, this was not the first time he had ever relayed concerns about the Morras, an earlier time being in connection with Nicini's brother Danny:

> Q: If it was around 1988 give or take a year that Danny stayed or visited the Morra home, was it around that time in which you suspected that Mr. Morra was [sic.] pedophile?
>
> A: I suspected that he was exploiting children.
>
> Q: Did you suspect that there might be drugs in th e household at that time?
>
> A: I felt that these children were going over ther e and in some way they had access to drugs and alcohol.
>
>    . . . .
>
> A: Around that time Danny was already involved wit h DYFS; is that correct?
>
> Q: Yes.
>
> A: Was his case worker Frank Cyrus at that time?
>
> A: I believe so.
>
> Q: Did you notify anyone at DYFS regarding your concerns that you have shared with me regarding the Morra household that there might have been some child sex there?

_____

9. The DYFS record entry also reflected that Mr. Nicini was "not pleased, Anthony not in hospital. He's going to call JFK Crisis to find out who psychiatrist is that released child." App. 227.

36

A: During what period?

Q: You indicated that Danny might have been stayin g at the Morra household and that you had your suspicions that there might be sexual abuse or some type of child abuse at the home; is that correct?

A: Yes.

Q: Did you notify or tell anyone at DYFS about tho se suspicions that you had?

A: I had mentioned it to a social worker. . . .

. . . .

Q: Do you recall what concerns or concern exactly you expressed to that person?

A: About the placement of children into foster car e. My concern with my son as far as what he was doing.

App. 230-231.10

Mr. Nicini's objections apparently left even less of an impression on Cyrus than Mrs. Nicini's, as Cyrus initially disavowed in his deposition having any recollection of objections by Mr. Nicini to placing his son with the Morras. After having the aforementioned DYFS record entry read to him, Cyrus recalled that he was likely aware of Mr. Nicini's objection but did not bother to pursue it further:

Q. Were you ever aware of that particular objectio n?

A. Yeah, I think I was, now that I read this over.

Q. Okay. Did you ever contact Mr. Nicini to discus s with him the basis of his objections?

A. No.

Q. Was there any reason for that?

A. No. No, I think, you know, like I was saying, w e were feeling, you know, good about the placement because everything was positive, everything was

_____

10. Mr. Nicini made clear in this deposition that he and his wife had never authorized Nicini's brother Danny to stay with the Morras. App. 231.

> pointing toward him doing well there and becoming
> stabilized and progressing, and so we had no real
> concerns at that time about that.

App. 228.

Failing to follow up on specific concerns communicated
to him and to DYFS about the Morras as an acceptable
placement for Nicini who, only weeks beforehand, was said
to be actively suicidal and in need of hospitalization, Cyrus
advocated that Nicini stay with the Morras, about whom he
knew little or nothing, telling Judge Segal that Nicini was
stable at the Morra house, that he was "doing very well
there, no problems." App. 155.11 And, largely on the basis
of Cyrus's position and representations, Judge Segal
ordered Nicini to remain with the Morras "for so long as
[DYFS] thinks that's an appropriate placement." App. 167.
Judge Segal had asked Cyrus if the Morras' home would
qualify as a para-foster home, to which Cyrus responded
"[y]es they would." App. 156. Although Cyrus qualified his
answer by saying that the only thing he had done was a

_____

11. A jury might wonder on what basis Cyrus could report to Judge
Segal that everything was positive. Cyrus's explanation seems to be
premised on an assumption, embraced by the majority to some extent,
that no further action was necessary to discharge his duties to Nicini as
long as certain parties professed to be content. Nicini claimed he liked
staying at the Morras, and, as Cyrus noted in his deposition, "Nicini
refused to go elsewhere." App. 145. The Morras were willing to have him
remain there and reported that there were "no problems." Of course,
when the Morras gave that report to Cyrus, Mr. Morra already had been
giving Nicini drugs and sexually abusing him, telling Nicini he would
have no place to go if he disclosed these activities. App. 232, 238. Could
not a jury find Cyrus's attitude to be an indictment rather than a
satisfactory explanation for Cyrus's inaction? After all, on Cyrus's
theory,
a case worker would never unearth a problem until it is too late. Should
not the concern have been the stability of the environment for this
suicidal youngster who had just climbed out the window of the
psychiatric ward, rather than whether he professed to be content there?
In light of Cyrus's weak and ineffectual -- and perhaps even indifferent
-- responses provided with respect to the numerous signposts of
potential danger with the Morra placement, it would not be difficult to
imagine a jury concluding that Cyrus's inaction rose to the level of
deliberate indifference if, during a trial, Cyrus were to provide similar
responses and to demonstrate a similar attitude.

38

PERP check, Cyrus assured Judge Segal that "[t]here's no -- nothing we've seen in terms of any problem with the law . . . . right now they are not an official foster family, although I'm sure they would -- they would apply for para-foster custody if the parents are willing to let them." App. 156-157. Cyrus explained again in his deposition that he had received updates from the Morras themselves. App. 226-227.

Concluding that the "background information available to Frank Cyrus which was completely ignored was substantial," Atkins opines as follows at the conclusion of his detailed report on Cyrus's handling of Nicini's case:

> The ongoing disregard of pertinent information at various stages of the investigation demonstrates not a simple negligent breach but a pattern of deliberate indifference to the right of Anthony Nicini to be secure in a safe environment and to be offered the same opportunity for protection/supportive services from DYFS as any other child.

App. 253.12

Although this expert report illustrates how the facts could produce an inference of deliberate indifference, the majority swiftly dismisses the relevance of Atkins' report in its entirety, apparently based on the fact that Atkins did not explain how Cyrus could have performed a national police search without the permission of the Morras. 13 Interestingly, Cyrus would have obtained the requisite permission, or been confronted with the refusal of permission, had Cyrus conducted a proper interview at the

_____

12. Atkins also opined that Cyrus's "multiple breaches constituted a pattern of indifference to his statutory and/or professional duty such that I conclude with a reasonable degree of psychological probability that this pattern of conduct arose not from mere negligence but from deliberate indifference to his obligation to conduct a proper investigation
and directly caused the injuries claimed by Anthony Nicini." App. 242

13. The majority further characterizes the report as "focus[ing] `particularly' " on this issue "without pointing to specific facts from which
Cyrus should have inferred that such a check was necessary." I can only wonder whether the majority is reading the same detailed, comprehensive report that I have described.

outset and asked basic questions that reasonably should have been explored before entrusting Nicini to the Morras, such as those posed to a para-foster applicant. Yet, Cyrus neither asked the pertinent questions, nor sought permission to do the search, until it was too late.

The majority properly concludes, in my view, that Cyrus and DYFS had a special relationship with Nicini and thus were charged with affirmative duties. Nicini was in the care and custody of the state. However, in light of its recognition of this duty, and in light of what the facts and expert witness testimony suggest that Cyrus knew or should have known about Nicini and the Morras, can one so facilely conclude as well that no reasonable jury could infer "deliberate unconcern for plaintiff 's welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse"? See Doe, 649 F.2d at 144; Taylor v. Ledbetter, 818 F.2d 791, 797 (11th Cir. 1987) (en banc) (adopting Doe articulation of deliberate indifference and finding that a foster child may bring a section 1983 action alleging that government officials were deliberately indifferent regarding her foster home placement).14 As the Supreme Court noted in Lewis, "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Lewis, 523 U.S. at 853. By rejecting the

---

14. Although Nicini does not specifically challenge whether Cyrus complied with certain DYFS requirements (e.g. , conducting a PERP check), and thus Doe is distinguishable in that respect, the substantive due process violation would be based on the state's alleged failure to provide for basic human needs of those in its custody, see DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989), regardless of whether the state has specifically regulated regarding all of
those needs. Surely we do not allow states to defeat substantive due process allegations by setting minimal standards for child welfare case workers. Would it not violate substantive due process for a state welfare case worker, with the requisite level of culpability, to allow a child to starve before his eyes, notwithstanding the absence of a specific state regulation requiring the feeding of children in the custody of the state? In light of other evidence giving rise to a strong inference of deliberate indifference, the fact that Cyrus took certain minimal steps required by DYFS regulations will not, by itself, defeat that inference or remove Cyrus's conduct from the realm of consideration.

40

valid competing inference clearly raised by the facts and concluding at this juncture that Cyrus's conduct was at most merely negligent as a matter of law, I believe the majority has short-circuited the process of addressing Anthony Nicini's substantive due process rights.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

41