Rotunda **TAYLOR**, et al.,

v.

Michael **GARWOOD**, et al.

No. CIV. A. 99–2478.

United States District Court,
E.D. Pennsylvania.

June 2, 2000.

Robert J. Sugarman, Sugarman & Associates, Philadelphia, PA, for Plaintiff.

James G. Sheehan, U.S. Atty's Office, Philadelphia, Scott A. Coffina, Asst. U.S. Atty., Philadelphia, PA, for Defendants.

## MEMORANDUM

BARTLE, District Judge.

This is an action pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In that case, the Supreme Court held that "a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." *Id.* at 389, 91 S.Ct. 1999. Plaintiffs allege that the four defendants, all federal government employees, committed constitutional violations in connection with the attempted arrest and subsequent death of Phillip McCall ("McCall").[1] Before the court is the motion of defendants Philip Jones ("Jones"), who had been McCall's probation officer, and Edward Cosgrove ("Cosgrove"), who was Jones' supervisor, for summary judgment.

We may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review all evidence in the light most favorable to the non-movant. *See Wicker v. Consolidated Rail Corp.,* 142 F.3d 690, 696 (3d Cir.), *cert. denied* 525 U.S. 1012, 119 S.Ct. 530, 142 L.Ed.2d 440 (1998).

### I.

The facts, taken in the light most favorable to plaintiffs, are as follows. Phillip McCall was a convicted bank robber sen-

---

1. The plaintiffs are the children of Phillip McCall.

tenced to five years probation on July 25, 1994. Prior to the commencement of his probation, McCall was committed to the Federal Medical Center in Rochester, Minnesota where he was diagnosed with and treated for paranoid schizophrenia. With medication, McCall's condition improved, and he was released to begin his sentence. Because of this medical history, McCall was assigned to the mental health unit of the probation office. Jones, who is a mental health specialist,[2] became McCall's probation officer on July 3, 1995.

McCall fulfilled the conditions of his probation without significant incident until December, 1996 when he tested positive for illegal drugs for the first time. The inauspicious change in McCall's behavior prompted Jones to supervise him more actively. Pursuant to Probation Office policy, Jones began to administer weekly urine tests and arranged for McCall to undergo drug and alcohol abuse counseling as well as psychological and psychiatric evaluations. Despite noting "somewhat paranoid-sounding speech patterns," the evaluation did not produce a specific diagnosis or prescribe medication. McCall tested positive for drug use on three additional occasions but never after March 21, 1997.

In May, 1997, McCall left his residence without informing Jones. McCall and his girlfriend had moved into the apartment of The Reverend Orlando Hughes, the girlfriend's uncle. On May 13, 1997, Jones received a telephone call from Mr. Hughes who claimed that McCall had physically assaulted him during an argument. McCall's prior drug use, his unannounced move, and the assault on Mr. Hughes were all contrary to the conditions of his probation, and Jones immediately prepared a violation of probation petition. As a result of a warrant signed by then Chief Judge Edward Cahn, McCall was arrested by Deputy U.S. Marshals without incident on June 10, 1997, and another psychiatric evaluation was ordered. This evaluation

recognized that "Mr. McCall exhibits a mild degree of possible paranoid ideation," but, like the evaluation done earlier in the year, did not recommend "antipsychotic" medication.

A violation of probation hearing was held in September, 1997 before Chief Judge Cahn. While the court found that McCall had violated the terms of his probation, it did not revoke his probation. Instead, in November, 1997, the court ordered McCall to be placed in a halfway house for twelve months, subject to a determination by a probation officer that McCall had "successfully adjusted." Jones arranged for him to stay at the Kintock Group's halfway house in Philadelphia. Jones met there with McCall's case manager, scheduled a conference with McCall, and ordered yet another psychiatric evaluation to take place in December. Consistent with the two previous evaluations, it was not recommended that McCall receive any medication.

Contrary to the three evaluations already performed that year, Jones believed that McCall needed both medication and more intensive therapy. Therefore, after informing Chief Judge Cahn, Jones arranged for McCall to receive inpatient treatment at Kirkbride Center, a Philadelphia mental hospital. Jones also prepared an order, subsequently signed by the court, for the U.S. Marshal to transport him to Kirkbride Center on February 6, 1998.

Later that day, however, Jones received a telephone call from Kirkbride Center advising him that McCall had refused any treatment beyond a preliminary psychiatric exam and that he was leaving the hospital. Rather than request an immediate detention of McCall, Jones made arrangements with McCall's daughter, who lived only a short distance from Kirkbride Center, to return him to the halfway house. Despite McCall's refusal of the medical treatment Jones thought necessary, Jones,

2. Mental health specialists are not physicians or mental health professionals.

in consultation with the court, chose not to challenge his probation.

The immediate events giving rise to plaintiffs' claim for relief began on April 10, 1998. That afternoon, the Friday before Easter, McCall left Kintock halfway house without permission to spend the weekend with his daughter, plaintiff Phyllis Brown. The following Monday, he returned to Kintock, but Kintock denied him re-admission on the ground that he had previously violated its rules by leaving without notice or permission. The next day, Jones informed McCall that this new infraction would be reported to the court. On April 16, Jones requested a hearing for possible violations of McCall's probation. The court scheduled a hearing for April 20, 1998.

While McCall appeared at the courthouse on April 20, he left before the hearing began. Nevertheless, the hearing went forward without McCall but with his attorney in attendance. At the conclusion of the hearing, Chief Judge Cahn revoked McCall's probation and entered an Order to this effect on April 23. On May 1, the court issued an arrest warrant and commanded the U.S. Marshal to arrest McCall for failing to appear at the hearing on April 20. Jones did not advise the U.S. Marshal service about McCall's recent history although it was aware generally about McCall, having arrested him previously in June, 1997.

Jones' supervisory role ended when the court revoked McCall's probation by order dated April 23, 1998. Nonetheless, Jones made at least two attempts to inform McCall of the arrest warrant in order to prevent any unnecessary confrontation. On April 20 and April 23, Jones called his daughter, plaintiff Brown, to suggest that he surrender. Jones' efforts were unsuccessful. On May 18, 1998, several Deputy U.S. Marshals attempted to arrest him. Although the parties dispute the events surrounding that attempted arrest, it is undisputed that a Deputy Marshal shot and killed McCall.[3]

## II.

Plaintiffs first contend that Jones is individually liable for his "grossly inadequate and deliberately indifferent" supervision of McCall which violated his Fifth Amendment rights and which resulted in his death. *See Bivens,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619; *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Fifth Amendment to the Constitution provides in pertinent part, "No person shall ... be deprived of life, liberty, or property, without due process of law."

█ It is a "well-established principle that the Due Process Clause [of the Fifth Amendment] does not impose an affirmative duty upon the state to protect its citizens." *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1368–69 (3d Cir.1992) (en banc); *see DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). There are two recognized exceptions to this general rule. First, government actors may be liable "when the State takes a person into its custody and holds him there against his will." *Id.* at 199–200, 109 S.Ct. 998. The creation of this "special relationship" imposes upon the government a constitutional "duty to assume some responsibility for [the] safety and general well-being" of the person whose liberty has been restrained. *Id.* at 200, 109 S.Ct. 998. Second, the "state-created danger" theory generates liability where the government "affirmatively acted to create plaintiff's danger, or to render him or her more vulnerable to it." *D.R.,* 972 F.2d at 1373; *see Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir.1996).

Plaintiffs in this case advance both exceptions to establish a constitutional claim against Jones.

---

**3.** The Deputy Marshal, who is also a defendant here, claims he acted in self-defense.

## A.

█ The "special relationship" theory has its roots in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Plaintiff in that case was a young boy who had been beaten and permanently disabled by his father. The department of social services had placed the child in his father's custody, but did not remove him when it had reason to believe he was being abused. The child sued the department and several of its social workers for violations of the due process clause.

The Supreme Court observed that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself," it has created or assumed a special relationship. *Id.* at 200, 109 S.Ct. 998. If "at the same time [the government] fails to provide for [that individual's] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.*

The Court highlighted three areas in which a special relationship and its attendant constitutional duties had been found to exist. First, the state is required to provide adequate medical care to incarcerated prisoners. *Id.* at 198, 109 S.Ct. 998 (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Second, the state has a duty to provide necessary health services to involuntarily committed mental patients. *Id.* at 199, 109 S.Ct. 998 (citing *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Finally, the state must provide medical care to pretrial detainees who have been injured while in police custody. *Id.* (citing *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)).

The *DeShaney* Court held, however, that the special relationship theory outlined in cases like *Estelle* and *Youngberg* did not apply to the circumstances before it. *Id.* at 201, 109 S.Ct. 998. Most significantly, the child was not in the state's custody when he was abused by his father. Furthermore, the government did nothing to create or exacerbate the risk of harm the boy faced. *Id.* Although the state had at one time offered shelter to the boy, it "did not become the permanent guarantor of [his] safety." *Id.*

Our Court of Appeals reached a similar result in *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir.1992) (en banc), holding that a school's authority over its students during the school day "cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney*." *Id.* at 1372. The court recognized that students are restricted in some meaningful ways. The state, for example, requires compulsory attendance, and schools exercise in loco parentis authority over their pupils during school hours. *Id.* at 1370. Students, nonetheless, are not subject to the "full time severe and continuous state restriction of liberty" that prisoners and involuntarily committed mental patients experience. *Id.* at 1371. While the court noted that some other jurisdictions had "imposed a constitutional duty to protect foster children by analogy to involuntarily institutionalized individuals," it found that situation inapposite. *Id.* at 1372. In contrast to a foster child who is "dependent upon the state, through the foster family, to meet the child's basic needs," a student is not so constrained and is free to have his or her needs met by other sources. *Id.* 1371–72.

Recently, in *Nicini v. Morra*, 212 F.3d 798, 808 (3d Cir.2000) (en banc), the Third Circuit followed other circuit courts in holding that the state has a special relationship with foster children. It observed that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties." *Id.*, 212 F.3d at 808.

The court found that "[f]oster children, like the incarcerated or the involuntarily committed, are 'placed ... in a custodial environment ... [and are] unable to seek alternative living arrangements.'" *Id.* (quoting *Taylor v. Ledbetter,* 818 F.2d 791, 795 (11th Cir.1987) (en banc)).

We conclude that the relationship of probation officer and probationer that existed between Jones and McCall is closer to that outlined in *DeShaney* and *D.R.* than the special relationships recognized in *Estelle, Youngberg,* and *Nicini.* It is true that while McCall was a probationer, he was subject to certain conditions imposed by Chief Judge Cahn. Among other conditions, McCall was required to report to his probation officer once a month, to work forty hours a week, and to participate in a program of mental health treatment. However, unlike prisoners, involuntarily committed individuals, or foster children, McCall was not in the physical custody of the United States in general or Jones in particular. *See DeShaney,* 489 U.S. at 201, 109 S.Ct. 998; *D.R.,* 972 F.2d at 1370–72; *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156, 167 (3d Cir. 1989). Nor was the government responsible for McCall's basic needs. *See Nicini,* 212 F.3d at 808. He was expected to use resources other than those provided by the government for food, clothing, and shelter. *See id.* Simply put, McCall was his own primary caretaker. *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998.

The Sentencing Guidelines state that "probation may be used as an *alternative* to incarceration." [emphasis added]. *United States Sentencing Guidelines Manual,* Introductory Commentary, Ch. 5, Pt. B (1998). As a probationer, McCall was not even subject to the special conditions of community confinement or home detention. *Id.* at § 5B1.3(e)(1), (2). In sum, McCall's probation was not an "incarcera-tion, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *De-Shaney,* 489 U.S. at 200, 109 S.Ct. 998. Like the school children in *D.R.,* McCall was subject to some control and supervision of his actions. Yet, as in *D.R.,* those reasonable restraints were not sufficient to establish a special relationship between McCall and his probation officer.

In any event, the important fact remains that at the time of McCall's death on May 18, 1998, he and Jones did not have any relationship at all, let alone a special relationship which would give rise to affirmative duties under the due process clause of the Fifth Amendment. Several weeks before, on April 23, 1998, Chief Judge Cahn had revoked McCall's probation. On May 1, the court issued a bench warrant for his arrest. From that point on, Jones had no responsibility for or control over what happened to McCall. The matter was then out of Jones' hands and in the hands of the U.S. Marshal.

### B.

■ Plaintiffs also claim that Jones is liable under a state-created danger theory as outlined by our Court of Appeals in *Kneipp v. Tedder,* 95 F.3d 1199 (3d Cir. 1996). In that case, a police officer stopped Samantha Kneipp and her husband, Joseph, for creating a disturbance on the highway. Protesting that he had to get home to meet the babysitter, Joseph was allowed to leave, but Samantha remained in the custody of the police. Eventually, Samantha was also sent home, despite the fact that she was obviously highly intoxicated, that it was a cold night, and that she was alone. Samantha never made it to her nearby apartment. Hours after her encounter with the police, she was found unconscious at the bottom of an embankment. The injuries sustained in the fall and exposure to the cold eventually resulted in severe and permanent brain damage.

■ After discussing the historical treatment of the state-created danger theory, the *Kneipp* court embraced a four element test. Constitutional liability for a state-created danger can be found if:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; [and] (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur.

*Id.* at 1208 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.1995)). Applying the test, the court determined that the summary judgment entered in favor of the defendants was not warranted. It concluded that Kneipp had presented sufficient evidence to raise a substantive due process claim against the police officers for affirmatively placing her in danger. *Id.* at 1211.

The facts in this case, in contrast, do not contain the four elements required to maintain a state-created danger cause of action. First, the harm tragically experienced by McCall was neither a foreseeable consequence of nor directly related to any of Jones' acts or omissions as McCall's probation officer. The alleged failures of Jones while supervising McCall—not requiring McCall to take antipsychotic medication, meeting with McCall too infrequently, belatedly requesting a violation of probation hearing—cannot be said to be the proximate cause of his death at the hands of a Deputy U.S. Marshal attempting to arrest him for a probation violation pursuant to a court order. Furthermore, Jones had no responsibility for and no control over the actions of the Deputy U.S. Marshal who actually shot McCall. The performance of Jones as a federal probation officer is just too far removed from the actions that took place on May 18, 1998.

Second, there is no evidence that Jones acted in "willful disregard" for McCall's safety. In *Kneipp*, the defendant police officer admitted that he was aware of Samantha's intoxication and impairment when he sent her home alone. The facts in this case, rather than prove willful disregard, actually demonstrate Jones' positive concern for McCall's well-being. For example, Jones twice encouraged McCall and his family to surrender peacefully after Chief Judge Cahn revoked his probation in April, 1998.

Third, while there did exist at one time a relationship between the two, Jones did not place McCall in danger of the relevant harm while that relationship existed. *See id.* at 1209. In fact, he attempted to obviate any harm by urging McCall to give himself up. It is undisputed that the harm that McCall did suffer occurred almost a month after the relationship between McCall and Jones had ended and as noted above resulted from the action of Deputy U.S. Marshals who were trying to arrest McCall.

Finally, Jones did not use his authority as McCall's probation officer to create "a dangerous situation or to make [McCall] more vulnerable to danger had [he] not intervened." *Id.* at 1209. In *Kneipp*, the police substantially increased the risk of harm Samantha Kneipp faced when they separated her from her husband. This case, however, is more similar to *DeShaney* where the Supreme Court concluded that when the state returned the child to his father's custody, "it placed him in no worse position than that in which he would have been had it not acted at all." *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998. In short, Jones did not use his authority or "peculiar position[ ]" as a government actor to leave McCall in a position of heightened, foreseeable danger. *Kneipp*, 95 F.3d at 1208; *Mark*, 51 F.3d at 1152.

Plaintiffs have not produced any evidence of a state-created danger so as to establish a substantive due process claim.

## C.

■ In order to demonstrate a violation of McCall's substantive due process rights under the Fifth Amendment, plaintiffs must show an abuse of executive power "so ill-conceived and malicious that it 'shocks the conscience.'" *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The exact degree of wrongfulness necessary to reach the conscience-shocking level varies with the type of case. In some situations, deliberate indifference will suffice, sometimes with a subjective test and other times with an objective test. *Nicini*, 212 F.3d at 810–11. In still other circumstances, the conscience-shocking level may be more than negligence but less than intentional conduct. *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708; *Nicini*, 212 F.3d at 810–11. Where professional decision makers are involved, the Supreme Court has held that the test of culpable conduct is whether there was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28; *see Nicini*, 212 F.3d at 811 n. 9. Because governmental conduct "that is shocking in one environment may not be so patently egregious in another," we must perform "an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708; *see Miller*, 174 F.3d at 375.

Even if plaintiffs had adduced evidence of a special relationship or a state-created danger giving rise to affirmative duties on the part of the government, and regardless of which standard of culpability is applicable here, plaintiffs have not shown a genuine issue of material fact that Jones' actions were an executive abuse of power that "shocks the conscience." *Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. In fact, we see no evidence in the record before us that Jones acted other than in an exemplary manner with a very difficult probationer. If we should be wrong in this regard, plaintiffs at most might be able to demonstrate that Jones performed negligently in his role as McCall's probation officer. Mere negligence, however, does not create a constitutional wrong. As the Supreme Court declared in *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), "Where a government official's act causing injury to life, liberty, or property is merely negligent, 'no procedure for compensation is constitutionally required.'" *Id.* at 333, 106 S.Ct. 662 (quoting *Parratt v. Taylor*, 451 U.S. 527, 548, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (Powell, J., concurring in result)). Jones has simply not violated any due process right of McCall. *See id.* at 329–31, 101 S.Ct. 1908.

## III.

Plaintiffs also allege that Jones violated McCall's Eighth Amendment right to be free from "cruel and unusual punishment."

■ Insofar as plaintiffs base their claim on the events of May 18, 1998, it cannot survive Jones' motion for summary judgment. Jones was not a party to the attempted arrest of McCall. He did not order the arrest, he did not execute the arrest warrant, and he did not shoot McCall. In this sense, plaintiffs have failed to show that Jones punished McCall at all.

■ Plaintiffs also assert that Jones' allegedly deficient probationary supervision of McCall amounts to an Eighth Amendment violation. "[W]hether a probationer has an Eighth Amendment right to be free from a probation officer's deliberate indifference to his medical needs" is an open and "novel question." *Fields v. McCannally*, 50 F.3d 14, 1995 WL 118903, at *1 (9th Cir. Mar.20, 1995). We will assume

without deciding the issue that McCall had such a right.

"The Supreme Court has stated that at a minimum, a plaintiff alleging an Eighth Amendment claim for inadequate medical care must establish that defendants acted with 'deliberate indifference' to 'serious medical needs.'" *Hall v. Smoyer*, No. CIV.A. 96–5296, 1998 WL 156981, at *4 (E.D.Pa. Apr.6, 1998) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Plaintiffs, however, have not produced any evidence that meets this test. The undisputed evidence presently before us shows that Jones acted properly in all respects. As discussed above, even if we are incorrect, plaintiffs at best have produced evidence that Jones' actions were negligent. That, of course, is not enough to establish an Eighth Amendment violation. *See id.* at 105–06, 97 S.Ct. 285.

## IV.

Defendant Cosgrove was Jones' supervisor at all relevant times. Little need be said about the claims against him. Suffice it to say that if Jones committed no constitutional violations, it ineluctably follows that his supervisor, who had no contact with McCall, committed no constitutional violations. *See generally, Baker v. Monroe Township*, 50 F.3d 1186, 1190–91, 1191 n. 5 (3d Cir.1995).

## V.

In sum, plaintiffs have not produced any evidence that Jones or Cosgrove violated McCall's Fifth or Eighth Amendment rights. Accordingly, the motion of defendants Philip Jones and Edward Cosgrove for summary judgment will be granted.[4]

4. The defendants have also argued qualified immunity. Because the Supreme Court has instructed us to decide the constitutional issues first and we have concluded no violation took place, we need not reach the qualified

*ORDER*

AND NOW, this day of June, 2000, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of defendants Philip Jones and Edward Cosgrove for summary judgment is GRANTED; and

(2) judgment is entered in favor of defendants Philip Jones and Edward Cosgrove and against plaintiffs Rotunda Taylor and Phyllis Brown.

immunity issue. *See Lewis*, 523 U.S. at 841 n. 5, 118 S.Ct. 1708; *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).