RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LINDA SUE SEXTON; MICHAEL SEXTON,

                *Plaintiffs-Appellees*,

*v.*

THOMAS CERNUTO,

                *Defendant-Appellant*.

No. 21-1120

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12574—Mark A. Goldsmith, District Judge.

Decided and Filed:  November 8, 2021

Before:  ROGERS, STRANCH, and DONALD, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Thomas L. Fleury, Gouri G. Sashital, Mindy Barry, KELLER THOMA, P.C., Southfield, Michigan, for Appellant.  Jonathan R. Marko, MARKO LAW, PLLC, Detroit, Michigan, Issa G. Haddad, HADDAD LAW FIRM, PLC, Bingham Farms, Michigan, for Appellees.

_____

### OPINION

_____

JANE B. STRANCH, Circuit Judge.  In 2017, Linda Sexton was sexually assaulted while participating in a court-ordered work program.  Thomas Cernuto and Larry Dunn supervised the program, and Sexton alleges that Cernuto actively sought to isolate her from other program participants to contribute to and enable Dunn to carry out the sexual assaults.  Sexton and her husband, Michael Sexton, allege 42 U.S.C. § 1983 and state-law claims against Cernuto for his

actions.  Cernuto brings this interlocutory appeal, arguing that the district court erred in denying his summary judgment motion for qualified immunity.

We **AFFIRM** the district court's denial of qualified immunity to Cernuto.

## I.  BACKGROUND

### A.  Facts

In July 2017, Linda Sexton reported to the Redford Charter Township maintenance building to begin her assigned five days with the work-release program.  Probationers performed clean-up tasks throughout the Township through the program, and Thomas Cernuto and Larry Dunn were the program supervisors.  After receiving yellow vests and instructions to stay within yellow painted lines in the building, Sexton and other program participants were told the rules of the program: do not bring cellphones; do not leave the premises without a supervisor's permission; wear appropriate clothing; and follow the supervisors' instructions.  Sexton was the only woman in the group of approximately five program participants that first day.

Redford Charter Township policy prohibited supervisors from driving alone with female probationers, and the supervisors told the participants to ride in a van with Cernuto to a gas station.  Dunn followed in a Township pickup truck.  When Sexton tried to return to the van at the gas station, Cernuto instructed Sexton to get out of the vehicle and come over to where he and Dunn were talking.  Cernuto explained to her that she would ride with Dunn in the pickup truck.  According to Sexton, the men were laughing and whispering when they made this decision.

During the drive to the worksite, Dunn asked Sexton personal questions, including about her marital status.  Dunn also told her she was beautiful, discussed his personal life, drove down a side street to show her his previous home with an ex-wife and to point out the houses of other family members on the street, and explained that he was divorced because his ex-wife had not been sufficiently sexually active with him.  Dunn then drove Sexton to the worksite.

After the work program finished picking up trash at that worksite, Sexton asked to return to the van, but Cernuto again insisted that she ride with Dunn in the pickup truck.  During her

second ride alone with Dunn that day, Dunn asked Sexton about her clothes and complimented her body, which made her uncomfortable. According to Sexton, this treatment continued throughout the day, with Dunn stating that he wanted to take her to his home and that he could find her anywhere. At one worksite, Dunn showed a cucumber to Sexton, making suggestive comments, and he touched her hand on their ride back to the maintenance building at the end of the day. Sexton considered telling Cernuto about her discomfort but decided against doing so because Dunn had told her that he was close with Cernuto and Cernuto had gotten him the work program job.

Dunn and Cernuto released the program participants early that day, leaving Sexton without a ride. As she began walking home, Dunn drove up to her and asked her to get in the car. Sexton declined. Before driving off, Dunn said that he knew where Sexton lived and that he could not wait to see her again.

When Sexton returned to the maintenance building the next day, Cernuto again ordered her to ride with Dunn in the pickup truck. Later in the day, Sexton heard Dunn and Cernuto talking about where the brooms, shovels, and weed whackers were. According to Sexton, the two were whispering and laughing immediately before Cernuto told Dunn to go to the maintenance building to get the equipment and to take Sexton with him.

Dunn began assaulting Sexton once they reached the equipment at the maintenance building. After handing Sexton two pieces of equipment, Dunn kissed her, put his tongue in her mouth, and touched her breasts. As Sexton let go of the equipment, Dunn put his hands in her pants and underwear. The assault culminated with Dunn touching and inserting his finger into her vagina. Sexton rode with Dunn back to the worksite and later to the maintenance building again. Before Sexton left the truck, Dunn explained to her that Cernuto had gotten him the supervisor job and that neither "told on" the other.

Later that afternoon, Cernuto again left Sexton with Dunn. Dunn took her to an old concession stand near the maintenance building to get a cooler and ice. After unlocking the door, Dunn instructed Sexton to go in first to the dark room and then began kissing and fondling her. Sexton told Dunn she was dizzy and left the concession building. When Sexton pointed out

that there was no ice or water in the concession building, Dunn laughed and explained that he already had both in his truck.

At the end of the day, Sexton began walking home. Dunn drove up to her several blocks from the maintenance building and offered her a ride. She refused. Cernuto drove up while Dunn and Sexton were talking, told Dunn to "have a good time," laughed, and drove off. Sexton understood this to mean that Cernuto knew what had happened between herself and Dunn. She did not return to complete the program.

Sexton reported the incidents to the Michigan State Police within a few weeks. Dunn initially denied to police that anything inappropriate had happened, but he later told the police that he and Sexton had consensually kissed. Dunn was later charged with criminal sexual conduct and pleaded no contest. The Township fired both Cernuto and Dunn after Sexton reported the assaults.

## B. Procedural History

In 2019, Sexton and her husband sued Cernuto, Dunn, and Redford Charter Township, alleging constitutional and state-law tort claims. At issue in this appeal are Sexton's claims against Cernuto for failure to protect (Count III)[1] and bystander liability/joint tortfeasor (Count IV) under 42 U.S.C. § 1983. Sexton's husband also brought a state-law loss of consortium claim (Claim X) that is not at issue here. Cernuto moved for summary judgment on all claims, arguing that he is entitled to qualified immunity on the § 1983 claims and that the loss of consortium claim must be dismissed as derivative of the constitutional claims.

The district court denied Cernuto's motion. It concluded that Cernuto could be liable for depriving Sexton of her right to personal security and bodily integrity because there were genuine disputes of material fact as to whether Cernuto took an active role in the assaults by isolating Sexton, and because a special relationship existed between Cernuto and Sexton such

---

[1]The complaint labels both the Fourteenth Amendment claim against Dunn and the failure to protect claim against Cernuto as "Count II." For clarity and because the failure to protect claim against Cernuto is the third count listed, it is labeled here as "Count III."

that he had an obligation to protect her from the assaults.**²**   In denying Cernuto qualified immunity, the district court explained that "[i]t is a clearly established right under the substantive component of the Due Process Clause that an individual has a constitutional right to personal security and to bodily integrity," and that "no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause."   The court explained that "taking the facts in the light most favorable to Sexton, she has created a triable issue that Cernuto violated" that right.

Cernuto timely appealed.

## II.  ANALYSIS

### A.  Jurisdiction & Standard of Review

Subject matter jurisdiction derives from 28 U.S.C. §§ 1331 and 1343 for suits brought under 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 1291, a district court's denial of qualified immunity at the summary judgment stage is immediately appealable as a final decision, "but only 'to the extent that it turns on an issue of law.'"  *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 495 (6th Cir. 2012) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005)).  A defendant may not appeal such an order "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."  *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995); *see also Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law.").  An appellate court may overrule a district court's finding that a factual dispute exists only when the record shows that the determination is "blatantly and demonstrably false."  *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011) (quoting *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007)).

Qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

**²**The district court, however, concluded that Cernuto could not be found liable under a state created danger theory.

which a reasonable person would have known.'" *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis has two parts. One prong requires the court to ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court must also evaluate "whether the right was clearly established." *Id.* On a summary judgment motion, the burden is on the plaintiff to satisfy both prongs. *See Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018). "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact'; that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## B. Violation of Constitutional Rights Prong

To prevail on her § 1983 claims, Sexton "must establish that a person acting under color of state law deprived [her] of a right secured by the Constitution or laws of the United States." *Smoak*, 460 F.3d at 777 (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358–59) (6th Cir. 2001)). Sexton alleges that Cernuto isolated her from the other probationers in the work program and ordered her to ride alone with Dunn so that Dunn could sexually assault her, violating her substantive rights to personal security and bodily integrity under the Due Process Clause of the Fourteenth Amendment. She claims that Cernuto is liable both for facilitating Dunn's assaults against her and for failing to protect her from the assaults.

The district court concluded that there were genuine disputes of material fact as to whether Cernuto is subject to bystander or joint liability (Count IV) because he was an active participant in violating Sexton's constitutional rights. The district court also concluded that Cernuto may be found liable on Sexton's failure to protect claim (Count III) under the "special relationship" theory.

Cernuto asserts that the district court improperly applied both prongs of the qualified immunity analysis. He argues that on the first prong of the qualified immunity analysis— whether Cernuto violated Sexton's constitutional rights—neither the "active" nor "special

relationship" theory of liability is applicable as a matter of law to a co-supervisor of a probation program. Specifically, he asserts that his "co-supervisor" status means that there is no legal basis for supervisory liability under § 1983; that he had no active role in a constitutional violation; and that no special relationship existed with Sexton such that a duty to protect her from sexual assault arose. On the second prong, Cernuto argues that the district court erred in finding that the constitutional right at issue in this case was clearly established. He contends that there was no "clearly established constitutional right that required Cernuto, a non-law enforcement, non-supervisory public employee, to protect [Sexton] from or intervene in a sexual assault by his co-worker."

### 1. Cernuto's "Active Role" Liability

Cernuto claims that, as a matter of law, he could not be liable for Sexton's assault under an "active role" theory because he was not Dunn's supervisor; instead, it is undisputed that the men "were co-supervisors of the work program." He also argues that the facts presented to the district court are insufficient to create a genuine dispute of fact as to whether "Cernuto encouraged and facilitated the sexual assault of Sexton."

Cernuto's focus on his relationship to Dunn misunderstands Sexton's joint liability claim. It is true that the cases in which courts have denied qualified immunity to a secondary actor for the constitutional tort of another government official often contain a supervisor and supervisee relationship. *See, e.g.*, *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994). But that relationship is not a necessary component of the claim, because the basis of liability for such claims is the active role that the supervisor took in the constitutional tort. "Section 1983 liability of supervisory personnel 'must be based on more than the right to control employees.'" *Griffith v. Franklin Cnty.*, 975 F.3d 554, 579 (6th Cir. 2020) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 511 (6th Cir. 1996)). Instead, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Doe*, 103 F.3d at 511 (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984), *cert. denied*, 469 U.S. 845 (1984)). In other words, the most pertinent factor for analyzing § 1983 liability is the causal relationship between the government official's actions and the alleged constitutional violation.

Our cases indicate that genuine disputes of material fact as to whether an official actively participated in another official's alleged constitutional violation are sufficient to satisfy the first prong of the qualified immunity analysis. In *Hall v. Shipley*, Hall brought a § 1983 claim against officers who conducted a nighttime forced entry and search of his home. 932 F.2d 1147, 1148–49 (6th Cir. 1991). Hall alleged that the officers required him to remain nude during part of their search. *Id.* at 1149. In his motion for summary judgment, an officer who had not instructed the plaintiff to remain unclothed argued he was entitled to qualified immunity because he was not directly responsible for the officers who had prevented the plaintiff from putting on clothes. *Id.* at 1154. On appeal, we concluded that the officer's "involvement cannot be characterized as 'mere presence' nor as 'mere backup,'" because he sought the warrant and executed the search. Our analysis did not focus on the officer's supervisory relationship with the other officers. *Id.* Instead, we emphasized the causal connection between the officer's actions and the alleged constitutional violation, concluding that the officer's active role was sufficient to defeat his summary judgment motion on the qualified immunity issue. *Id.*

The evidence Sexton alleges creates a record resembling that in *Hall*. Viewed in the light most favorable to Sexton, the evidence raises a genuine dispute of material fact as to whether Cernuto facilitated the assaults against Sexton. On several occasions Cernuto ordered Sexton to ride alone in the pickup truck with Dunn, in violation of the Township's policy against female probationers riding alone with supervisors. Cernuto refused each of Sexton's requests to ride in the van with the other probationers. Sexton also pointed to circumstantial evidence that Cernuto was aware of Dunn's plans, including the whispered conversations and laughter between the men before Cernuto issued his orders to Sexton to go with Dunn and Cernuto's statement to Dunn to "have a good time" with Sexton. This evidence raises a genuine factual dispute about whether Cernuto contributed to or enabled the assaults through repeated actions to isolate Sexton from the other program participants and to require her to be alone with Dunn. As a matter of law, an active participant in a constitutional violation can be held liable under § 1983.

## 2. Cernuto's Duty to Protect Sexton

The district court held that there was a special relationship between Sexton and Cernuto such that a reasonable jury could find Cernuto liable for failing to protect Sexton from the sexual

assaults. According to Cernuto, Sexton was not in his custody or otherwise sufficiently under his control in the work program, meaning that no special relationship with Sexton existed that would give rise to a duty to protect under the Due Process Clause of the Fourteenth Amendment. He further argues that, even if a special relationship existed, the duty to protect is only against *private* violence, not the violence of other state actors.

In *DeShaney v. Winnebago County Department of Social Services*, the Supreme Court concluded that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. 189, 196 (1989). There are, however, two exceptions under which the Constitution "imposes upon [the government] a corresponding duty to assume some responsibility for [the] safety and wellbeing" of an individual. *Id.* at 200. The first exception is when a "special relationship" exists between the state and the private individual due to the state's significant restraint on that individual's personal liberty. *Id.*; *see also Stemler v. City of Florence*, 126 F.3d 856, 867–68 (6th Cir. 1997). The second exception—the state created danger doctrine—applies when "the state takes an affirmative act that increases the victim's risk of harm" from private acts of violence. *Lipman v. Budish*, 974 F.3d 726, 733 (6th Cir. 2020); *see also Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017).

Although the district court rejected liability under the state created danger doctrine, it concluded that the facts supported application of the special relationship exception. Under this exception, the state has a duty to protect an individual when it has "so restrain[ed] an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Lipman*, 974 F.3d at 743 (quoting *DeShaney*, 489 U.S. at 200). The application of this exception typically requires "some state action that applies force (or the threat of force) and show of authority made with the intent of acquiring physical control." *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). The state's obligation "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the

limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.

Cernuto argues that the district court erred in finding that the facts, even viewed in the light most favorable to Sexton, could show the level of constraint on Sexton's personal liberty required to create a special relationship. Our cases analyzing whether a special relationship exists do not squarely address whether a work program for probationers is custodial in a way that could create such relationships. In general, a state official's mere physical control of an individual is insufficient to create a duty to protect. Putting an unconscious individual into an ambulance, for example, is not a restraint on that individual's personal liberty because the individual's incapacity, not the state actors, limits the individual's freedom. *Jackson*, 429 F.3d at 591; *see also Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 221 (6th Cir. 2007) (finding that emergency medical technicians were entitled to qualified immunity because the plaintiff "was unconscious at the time of his encounter with the defendants and could not perceive any restraint on his liberty or otherwise feel compelled to submit to a governmental show of force"). The threat of force alone is also insufficient to create a special relationship with the state if the individual was not placed "in a position where he was unable to care for himself." *Cutlip v. City of Toledo*, 488 F. App'x 107, 113 (6th Cir. 2012).

Cernuto devotes considerable attention to *Sargi v. Kent City Board of Education* to support his argument that a work program can never create a special relationship with the state. 70 F.3d 907 (6th Cir. 1995). In *Sargi*, the family of a student who had died from heart failure on a school bus brought a § 1983 action against a school board and administrators for failing to protect the student. *Id.* at 910–11. The family argued that compulsory attendance laws constrain students' liberty, creating a special relationship between the school district and its students. *Id.* at 910. We rejected this theory, explaining that attendance laws do not restrain students' personal liberties sufficiently to give the school board or administrators a constitutional duty to protect students. *Id.* at 911. We noted that "unlike imprisonment or commitment to a mental institution, compulsory school attendance does not restrict a student's liberty such that neither the child nor his parents are able to attend to the child's basic human needs." *Id.* Because "parents, not the state, remain the child's primary caretakers," the school environment does not

have the significant liberty restrictions that *DeShaney* recognized as necessary to create an affirmative duty to protect. *Id.*; *see DeShaney*, 489 U.S. at 200. According to Cernuto, the fact that Sexton could leave the work program at the end of the day and was still responsible for her own basic needs is comparable to the degree of restraint considered in *Sargi*.

The work program, however, placed far more restrictions on Sexton's liberty and her ability to care for herself than did the compulsory education laws or involuntary medical care that this court has previously analyzed. Through the probation work program, the state retained authority to physically confine Sexton, even if her liberty as a probationer was greater than that she would have had in prison. That Sexton could leave the work program at the end of the day is not dispositive. In *Garrett v. Belmont County Sheriff's Department*, we found sufficient allegations that state officials violated the constitutional rights of a woman who killed herself after being confined to county custody, released on bond, placed in a mental facility, and then released on bond again. 374 F. App'x 612, 618 (6th Cir. 2010). The court explained that even though the woman was no longer directly in state custody when she killed herself, the allegations that the state continued to have the authority to confine her under the terms of her bond, and had done so before, were sufficient to show the special relationship necessary to support the constitutional claim under § 1983. *Id.* Sexton's situation with the probation work program is similar. The Redford court ordered Sexton to participate in the work program. The program placed further restrictions on her personal liberty: cell phone use was prohibited; she was required to attend the program, wear a yellow vest, and follow Dunn's and Cernuto's orders; she was ordered to ride in state-owned vehicles; and she was taken to and from various worksites. Underlying these restrictions was the threat of incarceration should disobedience be found to violate her probation. These restrictions are sufficient to show a state "threat of force," *Jackson*, 429 F.3d at 590, and a restraint on Sexton's ability to provide for her own reasonable safety, *DeShaney*, 498 U.S. at 200.

Cernuto's arguments from out-of-circuit cases do not change this conclusion. Cernuto points to *Philadelphia Police & Fire Association for Handicapped Children, Inc. v. City of Philadelphia*, contending that "intermittent custody" cannot create a special relationship. 874 F.2d 156 (3d Cir. 1989). In that case, individuals with intellectual disabilities were required

to participate in state-sponsored day programs and were "absolutely dependent upon the state." *Id.* at 167–68. In a challenge to budgetary cuts, participants argued that the government had an affirmative duty to fund the programs. *Id.* at 158. The Third Circuit concluded that *DeShaney* foreclosed finding a duty without a custodial relationship because the program participants were only intermittently under state control and were allowed to leave at any time. *Id.* at 168. Cernuto also directs the court to a Pennsylvania decision holding that a probationer who "was required to report to his probation officer once a month, to work forty hours a week, and to participate in a program of mental health treatment" was not "in physical custody" and could provide for his own needs such that no special relationship existed. *Taylor v. Garwood*, 98 F. Supp. 2d 672, 677 (E.D. Pa. 2000), *aff'd*, 275 F.3d 38 (3d Cir. 2001). But the evidence, when viewed in the light most favorable to Sexton, shows that the Redford work program placed far greater restrictions on Sexton's liberty, including the threat of incarceration and limitations on physical movement. The program participants in *Philadelphia Police & Fire Association* were not directly threatened with incarceration due to non-participation. And unlike Sexton, the probationer in the Eastern District of Pennsylvania case was not in physical custody for stretches of time. Looking to *DeShaney*, the restrictions on Sexton's physical movement and personal liberty during her time in the work program were sufficient to create a special relationship between Cernuto and Sexton.

Cernuto's other argument that he was not the type of public official who would have a special relationship with a probationer also fails. He argues that the cases the district court relied on to find a duty to protect Sexton from sexual assault did not analyze the special relationship exception, and he also contends that the exception exclusively applies to law enforcement officers. According to Cernuto, because he "was not a law enforcement officer and had no authority to arrest the work program participants," the duty to protect cannot extend to him. This is a misreading of the cases on § 1983 liability. The courts have long acknowledged that non-law enforcement officers are liable for constitutional violations under § 1983. *See, e.g.*, *West v. Akins*, 487 U.S. 42, 57 (1988) (concluding that a private physician under contract with a state prison was a public official for § 1983 purposes); *Peete*, 486 F.3d at 223 (discussing the special relationship exception as applied to firefighters, paramedics, and emergency medical

technicians).  The special relationship exception, therefore, can apply to Cernuto as a non-law-enforcement official.

Cernuto concludes with the argument that "the 'special relationship' exception has traditionally been used to impose constitutional liability on the State for the actions of a private party."  He asserts that even if he had a duty to Sexton through a special relationship, that duty to protect applies only to *private* acts of violence, not those of a state actor like Dunn.  Cernuto points to language in our opinions specifying that the *DeShaney* exceptions are a means to hold public officials liable "for private acts of violence."  *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006); *see also Peete*, 486 F.3d at 223.  The district court, however, correctly analyzed this private acts issue only in the context of the state created danger exception to *DeShaney*, explaining that while "[i]t is not clear why the distinction between state and private actors exists in the Sixth Circuit," it was nevertheless necessary to find the state created danger exception inapplicable on that ground.

Cernuto's argument that the special relationship exception is also limited to protecting against private acts of violence would require an extension of our case law.  As shown by the district court's analysis, it is our line of cases on the *state created danger exception*—not the special relationship exception—that includes the requirement that the state must expose the plaintiff "to private acts of violence."  *Peete*, 486 F.3d at 223; *see also Estate of Barnwell by S.C.B. v. Grigsby*, 681 F. App'x 435, 443 (6th Cir. 2017).[3]  First, case law provides reasons not to apply this distinction to the special relationship exception.  Enforcing the distinction between state and private actors does not necessarily follow from *DeShaney*.  There, the question before the Court was whether state entities or agents had an obligation to protect a child from an abusive parent.  *DeShaney*, 489 U.S. at 195.  The Court did not address violence from a state actor because the violence in that case was by a parent, not a state actor.  *See id.* at 201.  And although *DeShaney* analyzed the duty to protect against private acts of violence, its holding includes the much broader proposition that "when the State takes a person into its custody and

---

[3]Other circuits have declined to adopt a "private violence" requirement for the state created danger exception.  *See, e.g.*, *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015); *Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005).

holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety." *Id.* at 199–200. To require that the violence complained of be private would significantly diminish this responsibility.

Second, the special relationship exception and the state created danger exception arise from different relationships, and that difference supports treating the two exceptions as distinct. The state created danger exception, as the Second Circuit has explained, "arises from the relationship between the state and the private assailant." *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). In contrast, the special relationship exception, by definition, concerns the "relationship between the state and a particular victim." *Id.* Paying greater attention to whether the harm arose from a state or private actor in the special relationship analysis would, therefore, introduce a distinction unrelated to the relationship from which the state obligation arises. In keeping with this logic, we have thus far limited the discussion of this apparent distinction between state and private violence to the state created danger exception. *See, e.g.*, *Peete*, 486 F.3d at 223 (discussing the private acts of violence requirement only when analyzing the state created danger exception); *Jackson*, 429 F.3d at 591 (explaining that the test for the "state created danger" exception includes whether "the decedent would be exposed to 'private acts of violence'"). Analyses of the duty to protect arising from special relationships do not appear to evaluate any public-private harm distinction, and Cernuto points to no cases in which this court or any other has explicitly held that the special relationship exception cannot apply when a state actor is the source of the victim's injury. In evaluating the exceptions to the general rule against a duty to protect, existing precedent and the rationale upon which such cases are based do not support extending the "private violence" requirement to the special relationship exception.

Because the work program placed significant limits on Sexton's personal liberties, she had a special relationship with Cernuto. Therefore, Cernuto had a duty to protect Sexton from harm while she was participating in the work program. When viewing the facts in the light most favorable to Sexton, a reasonable jury could find that Cernuto failed to protect Sexton from the sexual assaults. The district court did not err in reaching this conclusion.

**C. Clearly Established Right Prong**

Having determined that Cernuto could be liable for violating Sexton's constitutional rights under both of her § 1983 claims, we turn to whether the right was clearly established. "'[C]learly established law' should not be defined 'at a high level of generality'" but instead must be "particularized" to the case's facts. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). However, "a case need not be 'on all fours' with the plaintiff's case." *Beck v. Hamblen Cnty.*, 969 F.3d 592, 599 (6th Cir. 2020). The right instead "can arise 'from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs.'" *Id.* (quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 278–79 (6th Cir. 2019)). The fundamental requirement is that there is a "fair and clear warning" to government officials, *Vanderhoef*, 969 F.3d at 278, meaning that "[a] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right,'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The district court correctly identified the constitutional right at issue for Sexton's § 1983 claims. Under Sexton's claims against Cernuto for actively facilitating Dunn's assaults on her and for failing to protect her, this prong examines whether Sexton's right to be free and protected from a government actor's sexual assault against her was clearly established at the time Cernuto allegedly contributed to and enabled Dunn to carry out the sexual assaults. Citing precedent from our circuit, the district court explained that "there is no dispute that sexual assault is 'so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause.'" *Sexton v. Cernuto*, No. 19-12574, 2021 WL 37731, at *6 (E.D. Mich. Jan. 5, 2021) (quoting *Claiborne Cnty.*, 103 F.3d at 507).

The federal courts have long acknowledged the constitutional right to personal security and bodily integrity. "As far back as 1891, the Supreme Court recognized that '[n]o right is held more sacred, or more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference with others, unless by clear and unquestionable authority of law.'" *Claiborne Cnty.*, 103 F.3d at 506 (quoting *Union Pac.*

*Ry. Co. v. Botsford*, 141 US. 250, 251 (1891)). In *Claiborne County*, for example, we held that public school students have a "right to be free from sexual abuse at the hands of a public school employee." *Id.* at 506. Similarly, we have acknowledged a clearly established "constitutional right to be free from deliberate indifference to assault and sexual abuse" in the prison context. *Bishop*, 636 F.3d at 766. More recently, we confirmed in *Guertin v. Michigan* that the right to bodily integrity "is neither a 'general proposition' nor one 'lurking in the broad "history and purposes"' of the substantive due process clause." 912 F.3d 907, 934 (6th Cir. 2019) (quoting *al-Kidd*, 563 U.S. at 742). *Guertin*, which dealt with whether Michigan officials were entitled to qualified immunity from § 1983 claims related to lead in the Flint, Michigan water supply, emphasized that the right to bodily integrity has a special status within the law: "[T]o show that the government has violated one's right to bodily integrity, a plaintiff need not 'establish any constitutional significance to the means by which the harm occurs,'" as the right is one "to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Id.* at 919 (first quoting *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017); then quoting *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)). Other circuits have similarly found that "sexual assault by a government official acting under color of law constitutes a violation of due process that shocks the conscience." *Johnson v. Phillips*, 664 F.3d 232, 239 (8th Cir. 2011); *see also Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989) ("[T]he constitutional right Stoneking alleges, to freedom from invasion of her personal security through sexual abuse, was well-established at the time the assaults upon her occurred.").

Cernuto argues that the panel must define the relevant constitutional right in very narrow terms, proposing a requirement of near factual identity. Although the court is to consider "whether the violative nature of *particular* conduct is clearly established," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in original), it should also avoid a "rigid, overreliance on factual similarity" that could overwhelm the clearly established prong, *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 742 (2002)). Because he did not personally assault Sexton, Cernuto contends that the district court should have analyzed whether Sexton, "as a probationer in a work program, had a clearly established constitutional right that required Cernuto, a non-law enforcement, non-

supervisory employee, to protect her from or intervene in a sexual assault by his co-worker." Cernuto's formulation is flawed in several respects. First, it compels an "overreliance on factual similarity." Second, as discussed above, Cernuto's assertion that § 1983 liability is limited to law enforcement officials has no basis in our case law. Third, although Cernuto was not Dunn's supervisor, the record shows that he and Dunn were work program co-supervisors, both of whom had considerable authority over program participants. Fourth, his formulation of the constitutional right fails to identify the most pertinent aspect of Cernuto's relationship to Sexton—his authority and control over her in the probationary program. In sum, Cernuto misconstrues the constitutional rights at issue in Sexton's claims by seeking to rehash the special relationship analysis already conducted above. But that formulation improperly ignores the constitutional violation that Sexton claims: that Cernuto violated her right to personal security and bodily integrity both by *actively* facilitating the assaults and by failing to protect her from the assaults.

As to that duty to protect, even under Cernuto's narrower focus on whether it was clearly established that *he* had a duty, the answer is plain. Our case law has clearly established that government actors owe citizens "a constitutional duty to keep them from harm . . . when the state has acted to deprive an individual of certain indicia of liberty." *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997). In *Stemler v. City of Florence*, for example, we considered qualified immunity in the context of a § 1983 action against police officers who had "physically lifted" an intoxicated woman during a traffic stop and placed her in a car with her intoxicated and abusive boyfriend, whose subsequent driving killed her soon thereafter. *Id.* at 862–63, 868. Because the woman was in the defendant officers' custody when forced into the car, we concluded simply "that the defendants should have known under clearly established law that they owed [her] a duty not to force her into harm's way." *Id.* at 869. Similarly, Cernuto had significant authority over Sexton such that a special relationship existed when viewing the evidence in the light most favorable to Sexton. The record reveals that Cernuto ordered Sexton on multiple occasions to get into vehicles with Dunn in violation of township policy, had whispered and laughing conversations with Dunn before those orders and Dunn's assaults, refused to allow Sexton to rejoin the other program participants, and made comments suggesting

knowledge of Dunn's assaults. As *Stemler* indicates, it was clearly established that given Cernuto's degree of control over Sexton, he had a duty to protect her from harm.

Cernuto points to cases that he contends require more factually identical case law to show that a right is clearly established. The cases he cites, however, are almost universally about § 1983 claims of excessive force or unlawful arrest, both areas of law in which the constitutional rights at issue involve significant factual analysis. We recently emphasized that "[s]pecificity proves especially important in the excessive force context, an 'area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" *Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 286 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

In contrast, an individual's right to be free from a government official's sexual assault was clearly established in July 2017, including that facilitating such an assault would also violate that right. In addition to this established law, the Supreme Court has explained that: "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. Given the egregiousness of Dunn's sexual assault and Cernuto's alleged facilitation of it, Sexton's right to personal security and bodily integrity is so "obvious" that it can be deemed clearly established even without materially similar cases. For example, in *Hall v. Shipley*, we held "that a reasonable officer in appellant officers' position would have known that requiring an individual to sit naked while exposed to the cold January air would violate such individual's 'clearly established' rights" even if no case reaching the same conclusion existed. 932 F.2d at 1154. The key is whether public officials would have reasonable notice that their actions violate a constitutional right. Here, any reasonable supervisor would be aware that a probationer is entitled to be free from sexual assault and that facilitating the assault or failing to stop such an assault would contribute to a violation of clearly established rights.

Sexton's right to be free from sexual assault was clearly established in July 2017. The district court did not err in finding the second prong of the qualified immunity analysis satisfied and holding that Cernuto was not entitled to summary judgment on the qualified immunity issue.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of Cernuto's motion for summary judgment.